483 So.2d 979 (1986)
STATE of Louisiana
v.
John LANGFORD.
No. 85-K-1067.
Supreme Court of Louisiana.
February 24, 1986.
*980 Milton Brener, Dwight Doskey, Craft & Doskey, Milton Masinter, New Orleans, for defendant-applicant,
William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Harry F. Connick, Dist. Atty., Maria Lazarte, Michael McMahon, Susan Scott Hunt, Asst. Dist. Attys., for plaintiff-respondent.
CALOGERO, Justice.
On March 19, 1984, defendant John A. Langford was convicted of theft[1] in excess of $500.00 from the Hibernia National Bank of New Orleans.[2] He was sentenced to eight years' imprisonment at hard labor. The Court of Appeal affirmed.[3] We granted writs[4] to consider whether there was adequate proof of a non-consensual taking and/or a permanent intent to deprive the bank of its funds.
FACTS
On March 11, 1981, defendant met with a vice president in charge of lending at Hibernia to discuss borrowing $225,000 to purchase a Metairie restaurant. Two days later the vice president personally informed defendant that the loan was refused, primarily because of defendant's poor credit record.[5] Within a week, defendant returned to the same branch of the Hibernia to open an interest-bearing checking account, known as a NOW account (negotiable orders of withdrawal). A customer service representative supplied defendant the usual forms, including an application, signature card and deposit slip. Defendant exhibited a Louisiana driver's license, listed his place of employment as a company known as Furniture Distributors and deposited $5,362.21 to open the account. He neither inquired about nor requested overdraft *981 privileges; nor was he told that he would be afforded any such privilege.
NOW checking accounts were an innovation for Hibernia. Prior to January, 1981, federal regulations did not permit banking institutions to pay interest on checking accounts. With the change in the regulations, Hibernia joined other area banks in offering interest-bearing checking accounts to their customers. To accomplish this, it was necessary for the bank to purchase, install and modify a computer program within a very short period of time. Hibernia chose to purchase a program which was being offered to the banking community. Since this program was designed to accomodate the needs of numerous banks, it contained some features which were not consistent with the Hibernia's needs. One of the features of the computer program chosen was the incorporation of various options which a particular account could be given concerning the treatment of checks when the account is in an overdraft status. As will be discussed in greater detail below, the computer could be instructed to pay all or none of the checks as to which there were insufficient funds to cover. It could be instructed to establish a credit line, up to a maximum of $4,000. Additionally, the computer might put a "hold" on a check to await authorization by an account officer.
To accomodate these and other services, the computer program came with a set of Out of Balance Processing Codes (OBPs), which instructed the computer on routing and check payment information. Of particular importance were codes "01", "03" and "05". Code "05" instructed the computer to honor a check (apparently within a certain dollar range), but also to charge the account a fee for processing an overdrawn check; code "03" instructed the computer to honor the check (within a certain dollar range), but carried the further instruction not to charge a fee to the account. Code "01" instructed the computer to honor the check, regardless of the amount, at no charge to the customer. In other words, an "01" code gave the customer unlimited overdraft privileges. The coding was an internal matter; individual customers would not be aware, by scrutiny of account numbers or statements, whether their accounts had been assigned to the "01", "03" or "05" codes.
As new checking accounts (both regular and NOW) were opened, relevant information including OBP codes were input into the computer. The bank did not intend that NOW accounts should be given "01" coding or unlimited overdraft privileges, bank officials testified. Just the opposite occurred, however.
A former customer service representative at Hibernia's main branch testified that she placed checking account information into the computer during March of 1981. Unaware of the significance or meaning of the codes, and pursuant to instructions received from another employee, she used an "01" code on all new accounts.[6] As a result, eighty-four main office checking accounts received the "01" OBP designation. The error was compounded when the bank's monitoring controls failed, notably the routing and handling of Daily and Monthly Overdraft Reports. An "01" coding indicated to the bookkeeping department that any overdraft had already been approved by an account officer. Meanwhile, the Overdraft Reports were not being delivered to the account officers but, instead, were being discarded. The officers, however, had not been told to expect the Reports and, in the absence of inquiries from bookkeeping, had no idea of the status of "01" accounts assigned to them.
Defendant began using his NOW account. After the initial deposit of $5,362.21 on March 18, 1981, defendant made no further deposits. Within two weeks, the account was overdrawn.
*982 Defendant continued writing checks, however. He also began receiving overdraft notices from the bank. According to testimony of Hibernia officials, an overdraft notice is a computer-generated form sent one per check, "whenever there [is] activity that over[draws] the account...." Such a notice did not mean that an account had been reviewed by a bank employee. In defendant's case, these notices were sent daily. By the end of September, 1981 or within about 195 days, 198 such overdraft notices were sent to the defendant, each of them reflecting the amount of a given honored but NSF check, and a correspondingly increased negative, or overdraft, balance. Bank officials conceded the notices did not contain "specific wording ..." telling customers to come in and make a deposit but, as one witness put it, "[t]here are some things that are understood." In ever-increasing amounts over the six and one-half month period, defendant continued writing checks.[7] The first of his overdraft notices showed a negative balance of $237.79; the 198th and last, $848,904.39.
Finally, on the afternoon of September 23, 1981, the bank received a call from a curious teller at Fidelity Homestead. Defendant was attempting to obtain a certificate of deposit with a large check drawn on his Hibernia NOW account. In a routine check of his account balance, officials learned that defendant was overdrawn by $848,904.39. An inquiry made on that date to Furniture Distributors, the company which defendant listed as his employer when he opened the NOW account in March, revealed that defendant was not then, September 23, 1981, employed by that company.[8]
The following day defendant and his attorney met with bank officials. Hibernia's general counsel served written demand for immediate payment of the entire sum. Defendant, and his lawyer, countered with an offer to repay the balance over a five year period, at 8% interest, with interest payments monthly and principal payments annually. Hibernia declined defendant's offer and began civil proceedings in several parishes within the state in an attempt to recover the funds. Additionally, bank officials contacted the Economic Crime Unit of the Orleans Parish District Attorney's Office and assisted in the subsequent investigation. The defendant was thereafter charged with theft.
At his trial the facts recited above were proven. Additionally 213 checks were introduced into evidence bearing defendant's signature, date, amount and payee, as well as reverse side check endorsements and/or deposit notations. Those checks and what they tended to establish are discussed hereinafter in connection with assignment of error No. 2.
After a bench trial, the judge found the defendant guilty as charged of theft in excess of $500.00, and sentenced him to imprisonment for eight years with the Department of Corrections, with credit for time served.
STANDARD OF APPELLATE REVIEW
By his first two assignments of error, the defendant argues that there was insufficient evidence to prove that the taking was non-consensual and/or that he intended to deprive the bank permanently of its funds.
It is essential therefore that we begin our review with an inquiry as to the appropriate standard of appellate review, where insufficiency of the evidence is urged. Defendant's *983 ultimate argument is that the standard of Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) has not been met, i.e., that after viewing all of the evidence, much of it circumstantial, in the light most favorable to the prosecution, it is clear that there are reasonable alternative hypotheses other than the bank's non-consent and defendant's intent to permanently deprive, such that a rational trier of fact could not have found proof of each of these elements beyond a reasonable doubt.
Concerning circumstantial evidence La. 15:438 provides: "[t]he rule as to circumstantial evidence is: Assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." And, of course the state has the burden of proving every element of the crime beyond a reasonable doubt.
Relative to appellate review, this Court now employs a single standard for reviewing claims of evidentiary insufficiency applicable to circumstantial evidence cases as well as to cases involving direct evidence. In State v. Captville, 448 So.2d 676, 678, N. 2 (La.1984), this Court stated that "[t]he Jackson standard is an objective standard for testing the overall evidence, direct and circumstantial, for reasonable doubt." The Court had earlier recognized, in State v. Chism, 436 So.2d 464, 470 (La. 1983) that the statutory provision on circumstantial evidence, La.R.S. 15:438, "emphasizes the need for careful observance of the usual standard, and provides a helpful methodology for its implementation in cases which hinge on the evaluation of circumstantial evidence."
In Captville, supra, at 678-9, Lemmon, J., writing for a majority of the Court stated:
An appellate court reviewing the sufficiency of evidence must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstantial evidence must be sufficient for a rational juror to conclude beyond a reasonable doubt that defendant was guilty of every essential element of the crime. As stated by this court in State v. Chism, 436 So.2d 464, 470 (La. 1983), La.R.S. 15:438 "may not establish a stricter standard of review than the more general reasonable juror's reasonable doubt formula, [but] it emphasizes the need for careful observance of the usual standard, and provides a helpful methodology for its implementation in cases which hinge on the evaluation of circumstantial evidence." (emphasis in original)
ASSIGNMENT OF ERROR NO. 1
As already noted defendant contends that there was insufficient evidence to prove that the taking was non-consensual. The state, of course, had the burden of proving that the taking of the money was without the consent of Hibernia. First of all, there was a taking. At the least that taking occurred after the NSF checks were honored and the money came into defendant's possession (if that was by virtue of a mistake rather than consent on the bank's part), when defendant diverted or used the funds, instead of returning them. With respect to the bank's non-consent the Court of Appeal found that "[t]he evidence absolutely precludes the possibility that the bank consented to defendant's conduct. The bank was a victim of it's own mistakes, one in the erroneous coding of the account when it was first opened, and the other in the destruction of the computer printouts before they could be reviewed by a responsible official. The bank's intention was to allow no overdrafts on NOW accounts but this was frustrated by its unfortunate errors. That the bank consented to the defendant's taking $848,000 as some sort of loan is not a reasonable hypothesis when its refusal to loan defendant $225,000 one week before the account was opened is considered." 467 So.2d at 43.
With this assessment by the Court of Appeal we agree. The evidence overwhelmingly *984 supports the fact that no human person with the bank ever made a conscious decision to honor defendant's checks notwithstanding the account's overdraft status. Equally supported, and bearing on the aspect of the taking, is the conclusion that the defendant had to have known a mistake was being made.
"It is well settled that the recipient of the mistaken delivery who appropriates the property commits a trespass in the taking, and so is guilty of larceny, if, realizing the mistake at the moment he takes delivery, he then forms an intent to steal the property."
State v. Langford, supra, at 43, citing LaFave & Scott, Criminal Law § 85 (1972).
Defendant's argument that the record also supports the opposite conclusion, i.e., that the repeated honoring of the checks by the bank could be reasonably interpreted as consent to loan the money to the defendant, is not persuasive. In Captville, supra, at 680, this Court held that "[w]hen a case involves circumstantial evidence, and the [fact finder] reasonably rejects the hypothesis of innocence presented by the defendant..., that hypothesis fails, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt." The trial court acted reasonably in rejecting the defendant's hypothesis that the bank loaned him the money and therefore consented to the taking.
The facts established by the direct evidence and inferred from the circumstantial evidence were sufficient for a rational trier of fact to conclude beyond a reasonable doubt that defendant was guilty of the essential element of the crime of theft that the taking was non-consensual.
Defendant's first assignment is without merit.
ASSIGNMENT OF ERROR NO. 2
By his second assignment of error, defendant contends that the state failed to prove that he intended to deprive the bank permanently of its money.
Intent, like any other fact may be proved by circumstantial evidence. La. R.S. 15:445. This is evidence of one fact, or a set of facts, from which the existence of the fact to be determined may reasonably be inferred. McCormick, Law of Evidence, p. 435 (2d ed. 1972); Prosser, Law of Torts, p. 212 (4th ed. 1971). In criminal cases, the rule as to circumstantial evidence is: assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence. La.R.S. 15:438. State v. Chism, 436 So.2d 464, 468 (La. 1983).
The most favorable aspect of this case from defendant's perspective, concerning proof of intent to permanently deprive, is the manner in which defendant came by the bank's money. Because his NSF checks in ever increasing amounts were routinely being honored, and were simply prompting increasing negative balance overdraft notices (albeit up to $848,000), any reasonable person would assume that sooner or later the mistake would be discovered and the bank would call for repayment. Distinguish this from the embezzler who distorts records to hide a theft, or the robber who wearing a mask takes and absconds with another's property. The probability of discovery has some bearing on whether the defendant likely intended to deprive the bank permanently of its funds. Unlike the robber or embezzler, above, the defendant had to realize that sooner or later the bank would discover their mistake and call upon defendant to return the money. Furthermore, the evidence which the prosecution chose to present at trial does not show any apparent effort on defendant's part to hide the greater part of the money.
On the other hand there was significant evidence that defendant intended to deprive the bank permanently of its money upon receipt, or at least some of it, for in addition to his not giving any of the money back, he spent at least $12,000 on items in the nature of support and disbursed $113,000 *985 in large checks to various payees other than financial institutions.[9] The greater part of the money, $724,000, comprised checks made payable to homesteads and apparently deposited into accounts, possibly in defendant's name, in the respective homesteads. The record does not show what happened to any of the money thereafter.[10] When called upon to repay, defendant was unable, or unwilling, to do so. Rather on defendant's behalf the attorney offered defendant's promissory note.
One who takes another's property intending only to use it temporarily before restoring it unconditionally to its owner (i.e., one who normally is found not to have an intent to steal) may nevertheless be guilty of larceny[11] if he later changes his mind and decides not to return the property after all. LaFave & Scott, Criminal Law, § 88 (1972).
LaFave, supra, suggests that to counter inferred or proven intent to permanently deprive, a defendant must show both that he had the intent to return the property within a reasonable time, and that he had a substantial ability to do so.
The facts established by the direct evidence and inferred from the circumstantial evidence was sufficient for a rational trier of fact to conclude beyond a reasonable doubt that defendant was guilty of the essential element of the crime of theft, that the defendant intended to deprive the bank permanently of more than $500.
ASSIGNMENT OF ERROR NO. 3
By his third assignment of error the defendant contends that his sentence of eight years at hard labor was excessive.
The maximum sentence was ten years. The sentencing transcript shows that the trial judge carefully considered the guidelines of C.Cr.P. Art. 894.1 in arriving at a sentence. He noted that there were no mitigating circumstances such as provocation or social considerations such as dependents to warrant a sentence without imprisonment. Likewise he commented that a lesser sentence would deprecate the seriousness of a crime of such magnitude and noted that much of the money taken by defendant was never accounted for.[[12]] Given this meticulous attention to Art. 894.1 the trial judge is entitled to broad discretion in sentencing. State v. Gordon, 444 So.2d 1188 (La.1984). We are not convinced that such discretion was abused. This assignment is meritless. 467 So.2d at 44.

Decree
Defendant's conviction of theft in excess of $500 and his sentence to eight years imprisonment in the custody of the Department of Corrections are affirmed.
AFFIRMED.
LEMMON, J., concurs.
DIXON, C.J., dissents with reasons.
WATSON, J., dissents and assigns reasons.
*986 DIXON, Chief Justice (dissenting).
I respectfully dissent.
Defendant was "over charged" by the prosecutor. He might have been guilty of violating R.S. 14:71 (issuing worthless checks) but on the record before us he was not guilty of theft. The bank knew it was honoring defendant's overdrafts the only way a bank can know anythingby the knowledge of its employees (and machines) gained from the bank's records.
The bank cashed Langford's bad checks for six and one-half months and sent him one hundred ninety-eight overdraft notices. If it is possible to argue that the bank did not consent, because of its own mistake, then surely Langford's mistake was reasonable and was a defense. R.S. 14:16.
As an examination of the record shows the Hibernia knew Langford's account was coded to allow unlimited overdrafts and was apprised daily of his activities. It was aware his account was overdrawn and knew the extent to which it was. Had it chosen to object, it had a continuing opportunity to do so. Not only did it acquiesce, however, continually paying Langford's checks with knowledge of his negative balance, it affirmatively conveyed its acquiescence to him. Under these circumstances, Langford's conviction should not stand.
The bank officer in charge of bookkeeping, who assisted in selecting and installing the computer package, claimed at first that the bank did not anticipate overdrafts on interest bearing accounts. Yet she proceeded to explain the meaning of the various overdraft codes, including the "01" code, assigned to those accounts. After stating that "01" permitted unlimited overdrafts, that it was adopted and assigned to accounts such as Langford's only by mistake, and "should not have been allowed," she explained the procedures the bookkeeping department followed when "01" interest bearing accounts were overdrawn. Overdraft reports for "01" interest bearing accounts, of which bookkeeping received a copy, provided the negative balance of individual accounts on a daily basis. She admitted that such reports were produced on Langford's account and were received for review by the department. She testified that bookkeeping was in daily contact with the manager regarding overdrafts. The department said nothing of Langford's. Instead, she acknowledged, it mailed notices to Langford each day detailing his transactions. In my view these actions constitute consent and must be imputed to the bank.
The state argues that only the manager could consent to an overdraft. I do not think it is incumbent on the defendant in a case such as this to trace consent through an elusive and ill-defined chain of command to the ultimate figure in authority. The record does not disclose precisely how many Hibernia personnel had a hand in procuring and adapting the system or in maintaining Langford's account. A committee of bank officials selected a computer program with a code for unlimited overdrafts, supervised its installation and oversaw its operation. One service representative opened Langford's account, a second processed it as an "01" account and a third reviewed the processing the following day. The entire bookkeeping department, trained to handle overdrafts on such accounts, and knowing it was doing so, permitted Langford to draw checks against his. Those who testified either denied knowledge of what they did or their authority to do it. A designation of yet another employee whose participation or advices should have been solicited should not in this instance be found to vitiate the bank's consent.
Defendant's conviction ought to be reversed.
WATSON, Justice, dissenting.
As superficially appealing as the result is, this case represents the first time in history that a person has been jailed for overdrafting his bank account. Hibernia's negligence, and not defendant's criminality, was culpable.
I respectfully dissent.
NOTES
[1] LSA-R.S. 14:67.
[2] In fact the amount which the state attempted to prove, and which the evidence tended to establish was involved in the matter was $848,879.39, the amount which was charged in the bill of information.
[3] 467 So.2d 41 (La.App. 4th Cir.1985).
[4] 472 So.2d 907 (La.1985).
[5] There was some additional evidence concerning defendant's being a poor credit risk: evidence concerning an earlier bankruptcy arguably favorable to defendant, in as much as it showed that he was accustomed to dealing in large financial transactions. Although we do not take this evidence into account under assignments of error Nos. 1 and 2 where the issues are sufficiency of the evidence, we deem it worthy of note in this opinion if only to paint the entire picture of this defendant and his activities with which the trial judge was confronted when called upon to impose sentence (Assignment of Error No. 3).

Those facts are that fifteen months prior to defendant's application for the $225,000 loan, he had filed for bankruptcy, listing liabilities of $17,792,328.46 and assets of $10,132.00. His petition in bankruptcy court appears in the record and shows 149 creditors, of which a number were banks and savings and loan associations. Further, at the time of filing in bankruptcy court, defendant was a party to 44 pending lawsuits and, of these, two had been instituted by Hibernia to recover a total of $37,364.62.
[6] There is no indication the witness acted in concert with defendant. Her testimony (i.e., to the effect she neither knew defendant nor had ever spoken to him) is undisputed. Further, testimony from Hibernia's Security Chief at the preliminary hearing was that at no time did the bank believe or have reason to believe the witness was in league with defendant.
[7] For example, a glance at the list shows that in June some of defendant's checks include the following: $1,534; $2,085; $5,000 (six); $7,500 (two); $10,000 (five); $11,300; and $12,500 (six).

In July, a sample includes: $1,000; $1,050; $2,000; $4,850; $8,000 (two); $10,000 (two); $10,050; $10,500; $11,300; $11,900 (three); $12,000 (eleven); $12,100; $12,500; $12,600; $12,800; $12,850; and $75,000.
In August, a sample includes: $2,200; $5,000; $5,500 (two); $8,200 (two); $8,500; $9,000 (two); $9,200; $9,300; $10,000 (three); $10,500; $11,000 (two); $11,250; $12,000 (three); $12,250; $12,500; $12,800; $12,850 and $14,000.
[8] There is no indication that the defendant was not employed there on March 18, 1981, the day he opened the account, or at any other time.
[9] An examination of the cancelled checks introduced into evidence reveals that of the approximately $849,000.00, $724,000.00 was made payable to various saving and loan associations and deposited into accounts in those respective homesteads. Approximately $12,000.00 was spent on what appears to be living expenses. The remaining $113,000.00 was disbursed in large checks to various payees.
[10] Mr. William H. Moran, Jr., Manager of the Security Department at the Hibernia testified at the post-conviction bond hearing that the bank had recovered approximately $130,000.
[11] Although Louisiana does not have a crime of "larceny," since our "theft" statute encompasses common law larceny, we find common law authority helpful here. See La.R.S. 14:67, Reporter's Comment.
[12] Although as mentioned above in Assignment of Error No. 2, the state did not introduce any evidence in the case in chief which tended to show the defendant attempted to hide part of the money, at the post-conviction bond hearing the state proved the defendant had used an alias "John S. Andrews" or "Dr. John S. Andrews". The state also proved that the defendant used this name to purchase an automobile, open a checking account and attempt to obtain a driver's license.