504 So.2d 1169 (1987)
STATE of Louisiana
v.
Barry S. EDGE.
No. 86-KA-588.
Court of Appeal of Louisiana, Fifth Circuit.
March 16, 1987.
Writ Denied June 5, 1987.
Louise Korns, John M. Mamoulides, Dist. Atty., Dorothy Pendergast, Asst. Dist. Atty., Office of the Dist. Atty., Gretna, for plaintiff-appellee.
John Craft, I.D.B., Gretna, for defendant-appellant.
Before CHEHARDY, KLIEBERT and DUFRESNE, JJ.
DUFRESNE, Judge.
The defendant, Barry S. Edge, was indicted and charged with second degree murder in violation of R.S. 14:30.1. After preliminary motions were conducted, the defendant was found guilty as charged by a Jefferson Parish jury. Motions for Post-Judgment Verdict of Acquittal or for Rendition of Guilty of a Lesser Included Offense were denied by the trial court. The defendant was sentenced to life imprisonment at hard labor without benefit of parole, probation or suspension of sentence.
The defendant has appealed and urges three assignments of error. We find no error and affirm the conviction.

FACTS
In the morning hours of May 5, 1985, the victim, Clifford Stover, Jr., was found bleeding in the parking lot of his apartment complex at 330 Wall Boulevard. He had been shot twice. The victim was transported to a hospital where he died. The circumstances surrounding the victim's death were presented at trial as follows:
At 5:30 a.m. as Michael Moore and his wife were crossing the parking lot at 330 Wall Boulevard, they were almost run over by an automobile which was exiting the parking lot at a high rate of speed. The defendant was identified as the driver of the car.
On that same day at approximately 6:00 a.m., the defendant was stopped in St. Bernard Parish for speeding by Officer Jim Battaglia. When the defendant exited his car, he was clad only in a pair of underpants and did not have his driver's license. In explanation of his appearance he stated that he had been with a female and when her father returned he jumped out of a window, leaving his clothes behind. Battaglia looked inside the defendant's car and saw a .38 revolver on the floor partially underneath the seat. The defendant told Battaglia that the gun belonged to his father and that he had let his female companion fire it. Battaglia followed the defendant *1170 to his apartment and returned the gun after recording its serial number. He kept the bullets he had unloaded which consisted of two spent cartridges as well as live ammunition. The ammunition was lost prior to trial.
At trial, Battaglia testified that although the defendant's breath smelled of alcohol and he had an open bottle of wine in the car, he did not appear intoxicated. Battaglia also testified that he did not see any cuts, bruises or abrasions on the defendant's body.
Detective George Heath went to Wall Boulevard and when he entered the victim's apartment he found a trail of blood which led through the bedroom window, and into the parking lot where the victim had been found. He also discovered a bullet hole through the bedroom door and through a robe hanging on the door. A bullet was found inside the mattress.
Two days after the victim's death, his possessions were transported to his parents' home in Maryland. While sorting the clothes, his mother found a tee shirt and a pair of jeans which were too large for the victim. She also found the defendant's driver's license.
After the defendant had been arrested, the gun which Battaglia had seen in his car was seized by Detective Heath at the defendant's aunt's house in Talladaga, Alabama.
Dr. Monroe Samuels, an expert in the field of pathology, performed the autopsy of the victim. The results indicated that the victim had been shot twice. The first bullet entered the body at the lower part of the right rib cage and exited at the lower back. It was this wound which caused the defendant's death. The second bullet lodged itself in the upper right thigh. There was no gunpowder "tattooing" on the victim's body, indicating that the perpetrator had been more than four feet from the victim when the shots were fired. Dr. Samuels also testified that the victim could have remained conscious and lucid for some time after he had been shot.
Louise Braun, an expert in the field of firearms identification, compared bullets fired from the gun which had been in the defendant's car with the bullet retrieved from the victim's thigh. The results indicated that they were fired from the same gun.
Ronald Singer, an expert in firearms analysis, conducted tests on the bedroom door and the bathrobe. He concluded that the bullet entered and traveled through the door in a downward path slightly left to right. The bullet holes in the door and robe supported a conclusion that the door was closing as the shot was fired. The bullet went through the door, through the robe as it was hanging on the door, through an object approximately thirty-eight inches off the floor and into the bed. Singer stated that if a person had been squatting or sitting behind the door, the bullet would have entered his body around the ribs.
The victim's father testified that the victim was around 5'9" and weighed 135 lbs. and that the victim was a non-violent person who did not like guns and who would walk away from a fight. He had moved to Louisiana from Maryland to start up a new business and had been recently engaged to be married. His father also stated that, to the best of his knowledge, the victim was not homosexual.
His mother testified that he was a caring, generous and thoughtful person. The victim had never been a violent person and did not like guns. She also testified that her son was not homosexual.
Deborah Linsenmeyer testified that she was a Clinical Social Work Supervisor. She had first met the victim in 1978, when he was living with Patricia Jones, a friend of hers who he lived with for three years. Linsenmeyer stated that she had never seen the victim commit a violent act, argue or lose his temper. She also testified that of her own knowledge, the victim was not homosexual.
Emily Collins, the defendant's fiance, testified that the defendant was a truck driver who did not work regularly. He had a drinking problem and would drink during the day while she was at work. On May 4, *1171 1985, the defendant had been drinking most of the day. That evening he left the house and she went to sleep. She was awakened by his return at 6:30 a.m. when he was escorted home by the police officer. It was obvious that he had been drinking. When he walked in the door, he was clad in a shirt, underpants and socks. He had a cut on his ankle and his knee was injured. The defendant told her that he had been mugged by some blacks and they had taken his pants. Ms. Collins also testified that the defendant always wore nice shirts, not tee shirts.
The defendant testified that he had been drinking wine and scotch on May 4, 1985. He left the house around 10:00 p.m., then stopped at a Time Saver and bought a bottle of scotch. He already had a bottle of wine in the front seat. He then drove to New Orleans.
He stated he went to the Dungeon, a bar located in the French Quarter. While he was there he was approached by the victim, who asked if he wanted to "get loaded", offering the defendant coke and hash. The defendant agreed and followed the victim to his apartment.
He further testified that they began drinking and ingesting coke and hash. He passed out and when he awoke, he discovered that his pants were missing. He went into the bathroom to look for them, when he turned around he saw the victim, naked, standing in the doorway. The defendant started arguing with the victim about the location of his pants. He searched the apartment, finishing in the victim's bedroom. While he was in the bedroom, the victim grabbed the gun the defendant had placed by the sofa. The victim went into the bedroom and the two men started to scuffle. During the scuffle, the defendant's left knee and ankle were injured. The defendant took the gun from the victim and the gun went off. The defendant ran into the living room, slamming the bedroom door behind him. He could hear the victim yelling profanities as he grabbed his car keys from the coffee table. He heard the bedroom door knob turn, in reaction he turned and fired a shot through the door and then ran to his car and drove away. He was stopped by Officer Battaglia on his way home.
He further testified that he is six feet tall and weighs around 155 pounds.
On rebuttal, Detective Heath testified that he arrested the defendant. The defendant was advised of his constitutional rights prior to his making a statement. The defendant initially told Heath that he did not know the victim and that he had lost his pants when he was mugged at a Time Saver. As Detective Heath continued to take the defendant's statement, the defendant told him that he had met the victim at the Dungeon and followed him home. They began arguing because the victim told him that there would be people at the apartment and no one was there. The victim went to the defendant's car and brought the gun inside which he placed on the coffee table. The defendant went to the bathroom to clean his pants. When he returned the victim was wearing no clothes and pulled his pants off. He then grabbed the gun and fired into the air and left the apartment.

ASSIGNMENT OF ERROR NUMBER 1
The defendant filed a Motion for Post Verdict Judgment of Acquittal or, In the Alternative, for Rendition of Verdict of Guilty of Lesser Included Offense.
The defendant alleges that the trial court erred in denying his motion because the state failed to prove an essential element, that the defendant had the specific intent to kill.
In assessing the sufficiency of evidence, the reviewing court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); State v. Captville, 448 So.2d 676 (La., 1984). Where circumstantial evidence is used to prove the commission of the offense, La.R.S. 15:438 mandates that: "Assuming every fact to be proved that the evidence tends to prove in order to convict, *1172 it must exclude every reasonable hypothesis of innocence." This is not separate from the Jackson standard, but rather a "helpful methodology for determining the existence of reasonable doubt." State v. Porretto, 468 So.2d 1142 (La.1985); State v. Captville, supra. Ultimately, all evidence, both direct and circumstantial, must be sufficient to support the conclusion that the defendant is guilty beyond a reasonable doubt. State v. Porretto, supra. See also State v. Langford, 483 So.2d 979 (La.1986).
The defendant was convicted of second degree murder in violation of R.S. 14:30.1, which provides in pertinent part:
Second degree murder is the killing of a human being:
(1) When the offender has a specific intent to kill or to inflict great bodily harm; ...
The state attempted to show that the defendant had the specific intent to kill when he shot Clifford Stover, Jr. The defendant admits that he fired the two shots that killed Stover, but expressly denies having the specific intent to kill or to commit great bodily harm.
Specific criminal intent exists when the circumstances indicate that the defendant actively desires the prescribed criminal consequences to follow his act. R.S. 14:10(1). Specific intent, being a state of mind, need not be proven as fact, but may be inferred from the circumstances of the transaction and the action of the defendant. R.S. 15:445; State v. Fuller, 414 So.2d 306 (La. 1982); State v. Davis, 496 So.2d 1197 (La. App. 5th Cir.1986). The existence of specific intent is an ultimate legal conclusion to be resolved by the fact finders. State v. Graham, 420 So.2d 1126 (La.1982); State v. Davis, supra. The reviewing court's task is to determine whether the evidence, both direct and circumstantial, when viewed in the light most favorable to the prosecution, is sufficient to allow a rational trier of fact to conclude that the defendant had the specific intent to kill or to inflict great bodily harm beyond a reasonable doubt. See State v. Howard, 443 So.2d 632 (La.App. 3rd Cir.1983) writ denied 444 So.2d 1215 (La.1983).
In this case, the evidence at trial showed that:
(1) The defendant was two to three inches taller than the victim;
(2) The victim was shot twice at a distance of four feet or more, once through a door;
(3) Although the defendant alleged that he had fought with the victim, there were no cuts, bruises or abrasions on his body as observed by Officer Battaglia;
(4) Although the defendant alleged he was drunk, Officer Battaglia saw no evidence of such condition except the smell of alcohol, and the defendant was able to rationally explain his unclad appearance.
In addition, the defendant alleges that he fired the second shot because he saw the door opening, in which case he would have known that the victim was on the other side of the door. The defendant's contention that the first shot was fired while he and the victim were scuffling is negated by the absence of "tatooing" on the victim's body, indicating that the defendant was at least four feet from the victim when firing the gun.
Thus, it can be concluded that the defendant's action in firing one shot at the victim from a distance of four feet and one shot into a door when he knew the victim was behind that door supports a finding that the defendant had the specific intent to kill or inflict bodily harm beyond a reasonable doubt.
The defendant also alleges that the trial judge erred in failing to modify the verdict and to render judgment of conviction for manslaughter. C.Cr.P. art. 821(C). In support of his contention, he cites State v. Lombard, 486 So.2d 106 (La.1986), a case in which the court modified a verdict of second degree and rendered a judgment of manslaughter. In Lombard the Louisiana Supreme Court held that "sudden passion" and "heat of blood" are not elements of the offense of manslaughter, rather they are mitigating factors in the nature of a defense which exhibit a degree of culpability less than that present when the killing is committed without them.
*1173 Thus, a defendant must prove that he acted in a "sudden passion" or "heat of blood" to be entitled to a manslaughter verdict.
In this case, the defendant urges that he established by a preponderance of the evidence that he acted in "sudden passion or heat of blood", when he testified that he became enraged at the victim's conduct in removing his pants, failing to give them back and appearing in front of the defendant with no clothing. The state however, contends that the evidence that the victim was not shot at close range, and was shot twice; once through a door, negates a finding of provocation. In addition, it alleges that the defendant was taller and heavier than the victim and could have disengaged himself from any distasteful contact with the victim.
Considering the testimony and evidence presented, the jury could reasonably conclude that the defendant shot Clifford Stover with the intention to either kill Stover or to inflict great bodily harm to him and that he was guilty of second degree murder.
This assignment lacks merit.

ASSIGNMENT OF ERROR NUMBER 2
The defense urges that the court erred in admitting into evidence a pistol seized pursuant to a search warrant issued upon an application based upon a statement taken from appellant, which statement was suppressed.
Prior to trial, the defendant filed a Motion to Suppress the Confession and Evidence. The Motion to Suppress the Confession was granted because the uncounseled confession was obtained after the defendant invoked his right to counsel. The Motion to Suppress the Evidence, and more specifically the revolver, argued on the grounds that the discovery of the gun by Officer Battaglia was pursuant to an illegal stop, was denied. At trial, the defendant reurged his Motion to Suppress the gun. The basis for his motion was that the gun had been seized pursuant to information gained directly from the suppressed confession and was therefore inadmissible as "fruit of the poisonous tree." Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). The trial court denied the defendant's Motion to Suppress the gun for the reason that "court feels that based on the evidence and testimony this afternoon regarding this matter that it might have taken a little bit longer, but eventually the record indicates the weapon would have been retrieved."
In Nix v. Williams, 467 U.S. 431, 104 S.Ct. 2501, 2509, 81 L.Ed.2d 377 (1984) the United States Supreme Court adopted the "inevitable discovery" doctrine and stated that evidence found as a result of a violation of the defendant's constitutional rights, i.e. the right to counsel would be admissible "[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered."
The "inevitable discovery" doctrine was utilized by this court in State v. Williams, 461 So.2d 1118, 1123 (La.App. 5th Cir.1984).
In this case, the gun used by the defendant was seized, pursuant to a search warrant, from the defendants' aunts' house in Taladega, Alabama. The defense contends that the gun's location was revealed during the illegal confession and without that confession the gun would not have been seized. The State produced evidence to show that, without the use of the confession, the police knew the gun's serial number, and that the gun belonged to the defendant's father. The police also learned through an independent source that the defendant's father had moved to a town in Alabama and that the town's name contained the syllables "dega" or "digger" which he assumed to be Taladega. The authorities in Taladega supplied the police with the address of the defendant's father.
Here the state proved, by a preponderance of the evidence, that the location of the gun inevitably would have been discovered.
This assignment lacks merit.
A review of the record in this case reflects that no patent errors are present.
*1174 Accordingly, the conviction and the sentence of the defendant are affirmed.
AFFIRMED.