517 So.2d 390 (1987)
STATE of Louisiana
v.
A.J. FREEMAN.
No. 87-KA-387.
Court of Appeal of Louisiana, Fifth Circuit.
December 8, 1987.
*391 Bruce Whittaker, Gretna, for defendant/appellant.
D.B. Hussey, Asst. Dist. Atty., John M. Mamoulides, Dist. Atty., George Mustakas, Dorothy Pendergast, Asst. Dist. Attys., Gretna, for State.
Before BOWES, GAUDIN and DUFRESNE, JJ.
BOWES, Judge.
Defendant, A.J. Freeman, was charged with first degree murder in violation of LSA-R.S. 14:30. At the conclusion of the trial, a twelve-person jury unanimously found the defendant guilty as charged. He was then sentenced to life imprisonment at hard labor without benefit of parole, probation or suspension of sentence. Defendant appeals.
The facts of this case are as follows. Maria Yetta, the victim, and the defendant dated one another for a few months. Although Ms. Yetta maintained an apartment, she spent a lot of time with defendant. On Sunday, January 12, 1986, Ms. Yetta and the defendant spent the day together. Unfortunately, near the end of the day, the couple argued and, after defendant hit Ms. Yetta in the face, she asked some friends to take her home to the apartment she shared with Michelle Jones. Upon arriving home, Ms. Jones attempted to clean Maria's injuries and put her to bed.
Shortly thereafter, at approximately 9:00 p.m., the defendant knocked at the door and entered the apartment uninvited, allegedly to get his wallet from Maria. The couple began to argue again once Maria told him she wanted to end their relationship because she did not want him to hit on her anymore. The defendant again hit Maria and left the apartment, only to return again a few minutes later. This time, the defendant grabbed Maria by the hair, dragged her outside, and started beating and kicking her. Ms. Jones attempted to stop the defendant, only to have him strike her, knocking her to the ground. When Ms. Jones saw the defendant was going to stab Maria, she grabbed him around his leg in an attempt to stop him. As she did so, defendant stabbed her in the face. Michelle then backed away and ran for help. The defendant then inflicted multiple stab wounds upon Maria, causing her death with a stab wound to the right chest, going through the right lung and into the major vessel leading from the heart. The defendant left his knife in Maria's neck and fled the scene. He was apprehended approximately two hours later in LaPlace.
Defendant presents two assignments of error:
1. The evidence was insufficient to permit a rational trier of fact to conclude the appellant was, beyond a reasonable doubt, capable of forming specific intent.
2. The trial court erred in admitting gruesome photographs into evidence, the prejudicial effect of which clearly outweighed their probative value.
Assignment of Error No. 1
In assessing the sufficiency of evidence, the reviewing court must determine whether viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant *392 guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); State v. Captville, 448 So.2d 676 (La.1984).
In the present case, defendant was convicted of first degree murder pursuant to L.S.A.-R.S. 14:30(A)(3) which reads as follows: "A. First degree murder is the killing of a human being: (3) When the offender has a specific intent to kill or to inflict great bodily harm upon more than one person." Specific criminal intent exists when the circumstances indicate that the defendant actively desires the prescribed criminal consequences to follow his act. L.S.A.-R.S. 14:10(1). Specific intent need not be proven as fact, but may be inferred from the circumstances of the transaction and the actions of the defendant. The existence of specific intent is an ultimate legal conclusion to be resolved by the fact finders. State v. Edge, 504 So.2d 1169 (La.App. 5 Cir.1987).
In this assignment of error, the defendant argues that the State failed to meet its burden of proving specific intent to kill. More specifically, the defendant contends "that a clear preponderance of the evidence established that he was so intoxicated at the time of the crime as to have been incapable of forming the requisite intent."
L.S.A.-R.S. 14:15 provides in part:
The fact of an intoxicated or drugged condition of the offender at the time of the commission of the crime is immaterial, except as follows: ...
(2) Where the circumstances indicate that an intoxicated or drugged condition has precluded the presence of a specific criminal intent or of special knowledge required in a particular crime, this fact constitutes a defense to a prosecution for that crime.
Intoxication is in the nature of an affirmative defense to a criminal charge and the burden is upon the defendant to prove the existence of that condition at the time of the offense. State v. Gipson, 427 So.2d 1293 (La.App. 2 Cir.1983). "Whether voluntary intoxication in a particular case is sufficient to preclude specific intent is a question to be resolved by the trier of fact." State v. Brunner, 476 So.2d 548 (La.App. 1 Cir.1985).
In the present case, there was conflicting testimony as to defendant's appearance of intoxication on the night of the instant murder. Eyewitness, Michelle Jones, testified:
He (referring to defendant) was drinking. I've seen A.J. drunk. Many times I've seen him drunk, but he wasn't drunk. He was nice. He was being really nice and calm at first and he was talking to her (referring to the deceased victim, Maria Yetta) and then he started crying.
Raymond Bodenheimer, a friend of Freeman for approximately five years, testified that he saw him on January 12, 1986 at approximately 9:30 p.m. (which would be within approximately a half hour of the murder), and that Freeman did not appear to be intoxicated at the time. Both arresting officers, Brent Waguespack and Paul Spizale of the St. John the Baptist Sheriff's office, testified that the defendant did not appear to be intoxicated when they arrested him approximately two hours after the murder. In addition, Officer Waguespack testified that the defendant was coherent, was making complete statements, and was seemingly understanding everything he was told by the officers. Officer Spizale further testified that the defendant was functional at the time of his arrest, although perhaps apprehensive, that defendant did not appear befuddled or slow, and that he appeared to have all of his senses.
Deputy Anthony Foto, who transported the defendant from St. John to Jefferson Parish, at approximately 11:30 p.m. on the night of the murder, testified that the defendant did not seem incoherent, nor did he appear intoxicated. He further testified that the defendant's manner of speech was "well."
Detective James Trapani, the case officer in the Freeman case, testified that he first saw the defendant at approximately 1:00 a.m. on January 13, 1986, and that the *393 defendant did not appear to be intoxicated. Detective Trapani further testified:
Mr. Freeman was somewhat nervous and upset I believe in relation to the incident. After learning that it was Maria Yetta that had died he began crying. He was upset from that, but he was very coherent and he knew what was going on. I did not detect any odor of alcohol and he did not give any indications physically of being intoxicated.
After the State rested, defense counsel called several witnesses to contradict the above testimony. John Leiva, a friend of defendant's, testified that he saw A.J. Freeman and the victim, Maria Yetta, at about 6:00 p.m. on Sunday, January 12, 1986, and they were both drunk to a point that they could not walk or speak. The autopsy report indicated that Maria had consumed some alcohol, but the lab technician testified that it was not so much that she would have been incapable of walking or talking. Mr. Leiva further testified that when A.J. Freeman drinks, he forgets everything. David Freeman (defendant's brother) and Delores Numnum (defendant's neighbor of fourteen years) also testified at trial that they saw the defendant and the victim on January 12, 1986 and that both were drunk and arguing with each other. Delores Numnum, and her daughter Debra Bordelon, testified that when defendant would drink "he would be in his own little world" and would not remember anything that happened. The defendant's mother, Marcelena Freeman, testified that her son had a drinking problem and would drink almost every day and every night, and, that when he drank, he did not remember anything.
In addition to the facts recited above, the following evidence supports the jury's conclusion that the defendant had the requisite specific intent. After repeatedly stabbing Maria Yetta, the defendant left the crime scene and went to his brother's house. His brother, David Freeman, testified at trial that when the defendant arrived at his house, he was confused and crying, saying that he had done a bad thing. When his brother suggested going to the police, the defendant got scared and left. Although David Freeman testified that his brother was drunk in the evening, several hours prior to the murder, he did not testify as to his brother's intoxicated condition subsequent to the murder when the defendant went to his house. After leaving his brother's house, it appears that the defendant got into his vehicle and drove to LaPlace. While in LaPlace, the defendant called home, asking someone to come and get him because he had run out of gas. The police apprehended the defendant at the pay phone from which he called home after ascertaining his location from family members.
Also, according to the testimony of Raymond Bodenheimer, a friend of the defendant, at some point subsequent to the murder and before going to LaPlace, the defendant went to the house of Mr. Bodenheimer and told him that he stabbed a girl. After asking Bodenheimer to leave his musical equipment with his family, the defendant left.
Although there was some conflicting testimony, we are of the opinion that all of the evidence, taken together, overwhelmingly indicates that the defendant was aware of what he was doing and, in fact, had the requisite specific intent to commit first degree murder. This is especially true in light of the severity of the attack, whereby the defendant stabbed the victim multiple times, in addition to stabbing her roommate in the face. Of equal importance is the fact that the defendant was able to leave the scene, stop at both his brother's house and a friend's house, and then proceed to drive to LaPlace.
By the verdict returned, the jury obviously chose to give more credibility to the testimony of state witnesses, which included an eyewitness to the stabbing, indicating that the defendant did not appear to be intoxicated on the evening of the murder. Viewing the evidence in a light most favorable to the prosecution, we are of the opinion that any rational trier of fact could have found the existence of specific intent on the defendant's part and other facts necessary to sustain the defendant's conviction *394 for first degree murder and the jury correctly did so here. This assignment lacks merit.
Assignment of Error No. 2
In this assignment, defendant specifically objects to the introduction of photographs S-29 through S-41, as being gruesome and prejudicial effect of such introduction to the defendant outweighing the probative value. The photographs numbered S-29 through S-31 depict the victim's body as it was found at the scene of the crime. Of these photographs, S-29 and S-32 are close-ups showing the nature and extent of the victim's wounds. S-29 is a close-up of the inside part of the victim's left hand, and S-31 is a close-up of the victim's head and neck area, showing the weapon still in her neck. S-32 is a close-up photograph of the weapon itself with a blood-like substance on it. S-33 through S-41 are photographs taken during the autopsy depicting the nature and extent of the victim's wounds.
The defendant contends that the autopsy pictures were improperly admitted because they were not relevant to any disputed issue in the case. More specifically, defendant contends:
The record contains ample uncontradicted testimonial and photographic evidence establishing the manner of death. Indeed, the manner of death was never contested by Appellant. Rather, as noted above, Appellant merely attempted to show that his intoxicated condition precluded the formation of specific intent. As the photographs are material to no disputed issue, their probative value is nil. Consequently, their probative value is clearly outweighed by their prejudicial effect. It was thus clear error to allow the complained of photographs into evidence.
In State v. Moore, 498 So.2d 82 (La.App. 5 Cir.1986), this court set forth the standard used to determine the admissibility of allegedly gruesome photographs as follows:
The test in determining admissibility of photographs is whether the probative value of an allegedly gruesome photograph outweighs its prejudicial effect upon the jury, State v. Dean, 487 So.2d 709 (La.App. 5th Cir.1986). The evidence, of course, must also be relevant for some purpose, and a balance must be struck between the evidentiary value of the photograph and its tendency to overwhelm reason and to associate the accused with the atrocity without sufficient evidence, State v. Sterling, 377 So.2d 58 (La.1979). Generally, photographs of the body of the deceased victim have been held relevant to prove the death, to corroborate other evidence of the cause of death, to establish the location, severity and number of wounds, and to prove the identity of the victim. State v. Dean, supra, State v. Bennett, 454 So.2d 1165 (La.App. 1st Cir.1984).
The contested photographs in the instant case were included in the record and have been examined for their relevancy, alleged gruesomeness and prejudicial effect. We find that the photographs are relevant to show the severity of the attack, which is certainly a factor bearing on the issue of specific intent.
For these reasons, the trial court properly ruled these photographs admissible. The photographs were admitted not only to identify the victim, but also to substantiate the cause and manner of death and that this crime was intentional. In addition, the other evidence against the defendant is so overwhelming that the jury would not be prejudiced by these pictures alone to reach the wrong conclusion.
Accordingly, we hold that the probative value of the photographs clearly outweighed any possible prejudice they may have created in the jury's mind. This assignment lacks merit.
For the foregoing reasons, we affirm the conviction and sentence of the defendant.
AFFIRMED.