518 So.2d 543 (1987)
STATE of Louisiana
v.
Joseph WIGGINS, Jr.
STATE of Louisiana
v.
Ron WIGGINS.
Nos. 87-KA-402, 87-KA-403.
Court of Appeal of Louisiana, Fifth Circuit.
December 8, 1987.
*544 John M. Mamoulides, Dist. Atty., Dorothy A. Pendergast, Asst. Dist. Atty., 24th Judicial District, Parish of Jefferson, Gretna, for plaintiff-appellee.
Bruce Whittaker, I.D.B., Gretna, Ralph S. Whalen, Jr., New Orleans, for defendant-appellant.
Before BOWES, GAUDIN and DUFRESNE, JJ.
DUFRESNE, Judge.
Ron Wiggins and Joseph Wiggins, Jr. were charged, by grand jury indictment, with two counts of first degree murder, in violation of L.R.S. 14:30. At the arraignment each defendant, represented by his respective counsel, entered pleas of not guilty to both counts.
On January 13, 1987, trial as to both defendants commenced before a jury of twelve. Following deliberations, the jury unanimously found each defendant guilty of second degree murder on each count. Subsequent to the rendition of the verdict, each defendant filed a Motion for New Trial and Motion in Arrest of Judgment which were denied prior to the sentencing on February 26, 1987. Without exhausting the statutory delays, the court (on February 26, 1987) sentenced each defendant to life in prison without benefit of probation, parole, or suspension of sentence on each count, with the sentences to be served concurrently. It is from these convictions and sentences that the defendants are now appealing.

FACTS
Marta Rodriguez, a/k/a Jenny Lugo, who lived with Miguel Snyder (one of the victims) in New Orleans, testified that on the evening of February 16, 1986, at approximately *545 7:00 p.m., while Jesus Gonzales (another victim) was at the Snyder apartment, she called Ron Wiggins and told him that a pound of cocaine was waiting for him. Shortly after the phone call, Ron Wiggins, accompanied by his brother Joseph Wiggins, drove over to the Snyder apartment in a green Cadillac. Because the cocaine was at Jesus Gonzales' house in Gretna, the two groups then drove in their respective cars over the Mississippi River Bridge to the Canal Villere Supermarket at the intersection of Lapalco and Wall Boulevard in Gretna. Stopping in the supermarket parking lot, Snyder and his two companions told the Wiggins brothers to wait there while they went to Jesus Gonzales' house several blocks away to pick up the cocaine. When the three returned to the Canal Villere parking lot at approximately 8:05 p.m., Miguel Snyder and Jesus Gonzales, with the cocaine in hand, got into the Cadillac with the Wiggins brothers to complete the drug transaction, telling Marta Rodriguez that they would be back in five minutes and to stay in the car. Five or ten minutes after the Cadillac drove off, Marta Rodriguez saw three or four police cars racing by, proceeding in the same direction as had the Wiggins' Cadillac. When her two companions failed to return to the car after three or four hours, Marta went home, and on the following day found out that Miguel Snyder and Jesus Gonzales had been killed.
While cross-examining Marta Rodriguez, defense counsel tried to impeach her credibility with a taped statement she had made to him on December 11, 1986, while she was in prison. In this statement which was played at trial, Ms. Rodriguez stated that she was under the influence of cocaine on the night of the murders, and could not remember who was in the car or how long they were gone. However, on redirect examination, Marta Rodriguez testified that she had called the defense attorney because she was afraid for her life and that she subsequently left for California as there was a contract out on her. Thereafter, on redirect, Marta Rodriguez denied that she was intoxicated on the day of the murders, and that she was certain that the person in the car the night of the shooting was Joseph Wiggins.
Warren Hotard, who lived in the vicinity of the shootings, was also called as a state witness at trial. He testified that on February 16, 1986, at approximately 8:15 p.m. as he was driving down Mount Laurel near Cherrywood on his way to the grocery store, he observed a white male tugging at the doors of an automobile, parked alongside the road, in an apparent attempt to get inside the car. Mr. Hotard described this male as white with curly black hair wearing a brown and white sweater. He testified that he noticed this because the man ran directly in front of his vehicle, making him come to a complete stop to prevent from hitting him. At this time, Mr. Hotard also observed a second white man with a blue and white shirt sitting in the back seat on the right side and also a black male sitting in the front seat. Returning home from the grocery store, Mr. Hotard saw the man in the brown and white sweater who had run in front of his car and the man in the blue and white shirt lying in the street dead from gunshot wounds.
Mrs. Amelia McKay, who lived on Cherrywood, testified at trial that on the night of February 16, 1986, while watching television with her children in the front room of her house, she heard a noise which she thought was backfire from a car. When she went to the door to investigate the noise, she saw a car parked on the corner across the street, observed a black male get out of the front passenger side, go around to the back of the car, open the door, and fire two shots. Frightened, she went back into the house, called the police, and later saw two bodies lying in the street.
Detective Bernard Wortmann was summoned to the scene of the crime and upon arrival to the 400 block of Cherrywood Avenue, he found the bodies of Miguel Snyder and Jesus Gonzales lying dead in the middle of the street with gunshot wounds in the head and chest. Pursuant to a search warrant, Officer Wortmann located the Wiggins' Cadillac in a body shop, in the 2700 block of Earhart Boulevard in *546 New Orleans for repairing and repainting. Rather than seize the car immediately, the police surveyed the vehicle at its Earhart location waiting for the suspect to pick up the car. On March 7, 1986, the police were notified that the individual who dropped the car off was coming to pick it up. Subsequently, Officer Wortmann observed a Ford Elite containing two black men pull up in front of the body shop. One of the men got into the Cadillac and backed out of the shop while the other one drove off. After stopping both vehicles, the police found Joseph Wiggins in the Ford Elite, and in the Cadillac, they found an individual who had been hired to drive the car and who was found to have no connection with the present case. The Cadillac was subsequently impounded and searched. At trial, Officer Wortmann identified a photograph of the Cadillac which was being repainted a darker green and also identified photographs of the interior of the car depicting what he believed to be three bullet holes. Although he conceded on cross-examination that he could not be sure that the holes were caused by bullets, his view is reinforced by the fact that the police found some bullet fragments lying on the inside of the car door. Also found inside the vehicle were blood stains and a speed loader. The blood stains were tested and some were found to be consistent with the blood groupings of Miguel Snyder and Jesus Gonzales, although some of the enzyme groupings were inconclusive. Also, a fingerprint on one of the bullets in the speed loader was identified as that of Ron Wiggins. Additionally, although the murder weapon was never found, there was testimony by Louise Braun, a firearms expert, that the bullets in the speed loader were consistent with the type used to kill the two victims and also that the two victims were killed by the same gun.
Based on the above facts, the jury found each defendant guilty of two counts of second degree murder.
ASSIGNMENTS OF ERROR RELATING TO RON WIGGINS
ASSIGNMENT OF ERROR NUMBER 1
The trial court erred in allowing the prosecution to argue concerning the aggravating circumstance found in L.R.S. 14:30 A(3) "Where offender has specific intent to kill or inflict great bodily harm upon more than one person" since the state failed to make the essential averment in the indictment.
In this assignment of error, defense counsel for Ron Wiggins is arguing that the trial judge erred in allowing the state to argue to the jury regarding an aggravating circumstance which the state failed to allege in the indictment, more specifically, that the accused had to specifically intend to kill or inflict great bodily harm upon more than one person.
The indictment charged that the defendants committed first degree murder of Jesus Gonzales during the commission of an armed robbery and also committed first degree murder of Carbollo Miguel Synder during the commission of an armed robbery.
In his brief, defense counsel states: "This misled, confused, surprised, and caused great prejudice to the defendant who was prepared to defend against the allegation that he committed the offense during the commission of an armed robbery."
In overruling defendant's objection to this alleged error, the trial judge ruled that because the state listed this aggravating circumstance in its response to the Bill of Particulars, it would charge the jury and allow argument concerning the killing of more than one person.
It should be noted that it was in response to co-defendant Joseph Wiggins' Motion for a Bill of Particulars that the state indicated the aggravating circumstance ultimately charged to the jury. However, it is of no consequence that Ron Wiggins did not personally file a Motion for Bill of Particulars because "rule that if an objection has been made when more than one defendant is on trial, it shall be presumed, unless contrary appears, that objection has been made by all defendants should be extended to written motions by a co-defendant." State v. *547 Bergeron, 371 So.2d 1309 (La.1979); C.Cr. P. art. 842.
The state, however, was not allowed to argue the armed robbery portion of the indictment as absolutely no evidence of an armed robbery was introduced at trial.
The purpose of a bill of particulars is to provide an accused with sufficient information as to the nature and cause of the offense with which he is charged. La.C. Cr.P. art. 484; State v. Frith, 436 So.2d 623 (La.App. 3rd Cir.1983); writ den. 440 So.2d 731 (La.1983). It is now clear that the constitutional provision (L.S.A.-Const. Art. 1, Sec. 13) requiring that a defendant be informed of the nature and cause of the accusation is not to be restricted to mean that he must be so informed by indictment.
... The more reasonable rule is when the bill of information charging the defendant fails to set forth the detailed facts constituting the offense charged, his proper remedy is not a motion to quash, but a request for a bill of particulars. The principle that an indictment cannot be fleshed out by a bill of particulars is no longer valid, ...
State v. Griffin, 495 So.2d 1306, 1311 (La. 1986); see also State v. Gainey 376 So.2d 1240 (La.1979).
In the present case, the bill of particulars adequately informed the defendant of the nature of the charge against him. Moreover, it is clear from the indictment itself that the instant crime consists of the murder of two men.
In any event, it appears that this issue can be considered moot as the jury in this case returned a verdict of second (rather than first) degree murder on each count for both Ron and Joseph Wiggins. Thus, the existence of an aggravating circumstance is of no consequence.
This assignment of error lacks merit.
ASSIGNMENT OF ERROR NUMBER 2
The trial court erred in denying appellant's challenge for cause against a prospective juror.
ARGUMENT
At the voir dire examination, defense counsel challenged for cause Mr. Robert Moerer based on his responses to questions regarding the presumption of innocence and the burden of proof in a criminal case. The following exchange took place during the voir dire examination between Mr. Moerer and Mr. Whalen (representing Ron Wiggins) and now forms the basis for this objection:
BY MR. WHALEN:
Q. Mr. Moerer, if you hear some evidence in this case that makes you think that the defendants might be guilty of the crime, but you don't hear so much evidence that every reasonable doubt that you have is eliminated, what would your verdict be?
A. It's hard to say without hearing the evidence. I would have to say he was innocent, I guess.
Q. You have some questions about that?
A. Yes.
Q. I mean let's assume you had to go out and vote right now. What would your verdict be?
A. Innocent. I haven't heard any evidence otherwise.
Q. If you heard some evidence, but not so much that you didn't still have a reasonable doubt, what would your verdict be?
A. Probably innocent.
Q. Why do you say probably
A. Well, in all probability, if I haven't heard anything to convince me otherwise
Q. Well, do you understand that what we are talking about here is how much you have to hear? That is, you understand obviously that the defendants are presumed innocent at this time?
A. Yes.
Q. You understand that the prosecution has to prove they are guilty beyond a reasonable doubt?
A. Yes.
Q. Do you feel you ought to hear from both sides?

*548 A. Yes.
Q. Do you feel you ought to hear from both sides?
A. Yes.
Q. Do you feel like you are going to be unable to make a fair decision unless you hear from both sides?
A. No. But I feel that the man should be able to stand up and defend himself if what he said is the truth.
Q. I appreciate you saying that. Do you feel like you will hold it against these defendants if they don't testify?
A. No.
Q. Well, I don't understand how you square those two things. Can you explain it to me?
A. Not really, but I feel that if a person says he's innocent, if he can't defend himselfI realize the burden of proof is on the other party, but if he can't substantiate his story
Q. I understand why you would feel that way. I don't have any problem with that and it's a common feeling. The guy didn't do anything wrong. What's he doing here if he didn't do anything wrong? Let him come and tell me. That is pretty much the way you feel?
A. Basically, yes.
Q. That's understandable. Now, what I can't understand is how you can say on one hand you want them to testify and if they don't, you won't hold it against them. It's all right if you will and we understand that's going to bother you a little bit.
A. It won't bother me, I said
Q. Is it going to make you tend to convict them if you don't hear from them?
A. No.
Q. But, you do have a problem with that?
A. Somewhat.
MR. WHALEN:
That's all. Thank you, sir.
Your Honor, we would urge a challenge for cause for Mr. Moerer.
THE COURT:
He said he wouldn't hold it against the defendant if he doesn't testify and I accept that as true. The motion is denied.
MR. WHALEN:
Note an exception to objection to the court's ruling.
MR. DE AGANO:
I join in with that.
MR. FANNING:
He's acceptable to the state, Your Honor.
THE COURT:
Swear him in.
Both our federal and state constitutions guarantee the accused in a criminal proceeding the right to a trial by an impartial jury. U.S. Const.Amendment VI; La. Const. Art. 1, Section 16. In addition, La. C.Cr.P. art. 797(2) which reads as follows:
The state or the defendant may challenge a juror for cause on the ground that:
(2) The juror is not impartial, whatever the cause of his partiality. An opinion or impression as to the guilt or innocence of the defendant shall not of itself be sufficient ground of challenge to a juror, if he declares, and the court is satisfied, that he can render an impartial verdict according to the law and the evidence.
A challenge for cause should be granted, even when a prospective juror declares his ability to remain impartial, if the juror's responses as a whole reveal facts from which bias, prejudice or inability to render judgment according to law may be reasonably implied. However, when a prospective juror has volunteered an opinion seemingly prejudicial to the defense, but on further inquiry demonstrates the ability and willingness to decide the case impartially according to the law and evidence, a challenge for cause is not warranted. State v. Heard, 408 So.2d 1247 (La.1982); see also State v. Isaac, 487 So.2d 565 (La. App. 4th Cir.1986), State v. Bates, 397 So. 2d 1331 (La.1981).
A trial judge, however, is granted great discretion in ruling on a challenge for cause, and such a ruling will not be disturbed unless when reviewing the entire *549 voir dire as a whole there is an indication that there was an abuse of discretion.
In State v. Shea, 421 So.2d 200 (La.1982), cert. granted 466 U.S. 957, 104 S.Ct. 2167, 80 L.Ed.2d 551 (1984), reversed on other grounds, 470 U.S. 51, 105 S.Ct. 1065, 84 L.Ed.2d 38 (1985), on remand, 466 So.2d 449 (La.1985), the defendant argued that the trial court erred in denying its challenge for cause of prospective juror Nathaniel Williams on the grounds that on the voir dire examination he was not impartial and would not accept the law as given the court.
Initially, while he recognized the presumption of innocence and the state's burden to prove guilt beyond a reasonable doubt, the juror indicated that he would expect the defendant to produce some evidence on his own behalf in order to find him not guilty. However, upon being further instructed by the trial judge in this respect and in response to additional questions, Mr. Willis said that "it would be kinda hard" but he could and would apply the law according to the court's instructions.
We believe the juror's initial answers in this instance were brought about more from a lack of understanding of the law than bias. From our review of the entire voir dire examination we are convinced of the juror's ability and willingness to decide the case impartially according to the law and evidence. We therefore conclude that the trial judge did not abuse the broad discretion vested in him in ruling on this challenge for cause. State v. Sheppard, 350 So.2d 615, 638, (La.1977); State v. Sonnier, 379 So.2d 1336, 1352 (La.1980); State v. Bates, 397 So.2d 1331, 1333 (La.1981).
State v. Shea, supra at 205.
Compare State v. Nolan, 341 So.2d 885 (La.1977) where the Louisiana Supreme Court found that the trial court abused its discretion in failing to excuse a juror for cause based on her incapacity to understand the law.
The trial judge, in the present case, was satisfied that the juror could render an impartial verdict according to the law and evidence despite the juror's initial contention to the contrary. Applying the jurisprudence to the instant set of facts indicates that the trial judge did not abuse his wide discretion in determining that the prospective juror could be impartial.
This assignment lacks merit.
ASSIGNMENT OF ERROR NUMBER 3
The trial court erred in misleading and confusing the jury through its instruction concerning circumstantial evidence and the State's burden to exclude every reasonable hypothesis of innocence.
In its instructions to the jury, the trial judge stated in part as follows:
Evidence is direct or circumstantial. Either type of evidence is sufficient to convict under certain circumstances and in accordance with law. Direct evidence is evidence which if believed proves a fact. Circumstantial or indirect evidence is evidence which if proved proves the fact and from that fact you may logically and reasonably conclude that another fact exists. You cannot find the defendants guilty solely on circumstantial evidence unless the facts proved by the evidence exclude every reasonable hypothesis of innocence. The key word of that legal phrase is "reasonable". You can not reach for speculation, conjecture or anything else in order to provide an unreasonable hypothesis of innocence. Circumstantial evidence involves, in addition to the assertion of witnesses as to what they have observed, the process of reasoning or inference by which a conclusion is drawn. Like all other evidence it may be strong or weak. It may be so unconvincing it may be quite worthless or it may be irresistable and overwhelming. No man would not accept dog tracks in the mud against the sworn testimony of a hundred eye witnesses that no dog passed by. The gist the [sic] of circumstantial evidence and the key to it is the inference or process of reasoning by which a conclusion is reached. This must be based on the evidence given together with a sufficient background of human experience to justify the conclusion. Let me give you an examine [sic] *550 of direct and circumstantial evidence. The occupant of an apartment hears a gunshot in an adjoining apartment and rushes to the apartment. He finds Smith with a gun in his hand standing over a body identified as Jones. No one has seen Smith kill Jones. The circumstantial evidence that the shot was heard, that the witness immediately approached the apartment in which the crime took place, is strong circumstantial evidence. In fact any reasonable person from such a set of facts could conclude that Smith killed Jones. [emphasis added]
The underlined portion of the above instructions represents the portion to which defendant is now objecting. It should be noted at this point that neither defense counsel objected to this portion of the jury charges at the trial court level.
La.C.Cr.P. art. 801 provides that a "party may not assign as error the giving or failure to give a jury charge or any portion thereof unless an objection thereto is made before the jury retires or within such time as the court may reasonably cure the alleged error.
Absent such a contemporaneous objection, a defendant may not on appeal complain of the judge's charge to the jury. La.C.Cr.P. art. 841; State v. Parker, 506 So.2d 675 (La.App. 5 Cir.1987).
Even though this issue is not properly before the Court, the merits of the defendant's claim will be briefly addressed.
La.C.Cr.P. art. 804(A) reads as follows:
A. In all cases the court shall charge the jury that:
(1) A person accused of crime is presumed by law to be innocent until each element of the crime, necessary to constitute his guilt, is proven beyond a reasonable doubt;
(2) It is the duty of the jury, in considering the evidence and in applying to that evidence the law as given by the court, to give the defendant the benefit of every reasonable doubt arising out of the evidence or out of the lack of evidence in the case; and
(3) It is the duty of the jury if not convinced of the guilt of a defendant beyond a reasonable doubt, to find him not guilty.
The court may, but is not required to, define "the presumption of innocence" or "reasonable doubt" or give any other or further charge upon the same than that contained in this article.
In cases involving circumstantial evidence, a defendant is additionally entitled under L.R.S. 15:438 to have the trial judge instruct the jurors that they must be satisfied the overall evidence "excludes every reasonable hypothesis of innocence". See State v. Captville, 448 So.2d 676 (La.1984); State v. Butler, 462 So.2d 1280 (La.App. 5 Cir.1985).
Furthermore, when reviewing the propriety of jury charges, the Louisiana Supreme Court has consistently held that a jury charge must be considered as a whole, and particular expressions in a charge must be construed in the context of the entire charge. "Thus, it has declined to reverse the conviction on the ground of an erroneous charge unless the disputed portion, when considered in connection with the remainder of the charge, is erroneous and prejudicial. State v. Motton, 395 So.2d 1337 (La.1981); cert. den. Motton v. Louisiana, 454 U.S. 850, 102 S.Ct. 289, 70 L.Ed. 2d 139 (1981); State v. George, 346 So.2d 694 (La.1977);" State v. Butler, supra at 1285.
In the present case, defendant appears to be specifically objecting to the example given by the judge (see underlined portion of the jury charge). Even if the example was improper, reading the charge as a whole, it is clear that the trial judge properly instructed the jury on the State's burden of proof. The charges, when read as a whole, are clear and appear to correctly state the law regarding the burden of proof when circumstantial evidence is involved.
This assignment lacks merit.
ASSIGNMENT OF ERROR NUMBER 4
The evidence offered by the State is insufficient to support the verdict returned by the jury.
*551 ARGUMENT
As each defendant alleges insufficiency of the evidence, the following discussion will pertain to both defendants.
In assessing the sufficiency of evidence, the reviewing court must determine whether viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Captville, supra. Where circumstantial evidence is used to prove the commission of the offense, La.R.S. 15:438 mandates that: "Assuming every fact to be proved that the evidence tends to prove in order to convict, it must exclude every reasonable hypothesis of innocence." This is not a separate test from the Jackson standard, supra, State v. Porretto, 468 So.2d 1142 (La.1985) but rather a "helpful methodology for determining the existence of reasonable doubt." State v. Captville, supra. Ultimately, all evidence, both direct and circumstantial, must be sufficient to support the conclusion that the defendant is guilty beyond a reasonable doubt. State v. Porretto, supra.
In the present case, both Joseph Wiggins and Ron Wiggins were charged with two counts of first degree murder, but were convicted of two counts of second degree murder. The elements necessary to sustain a conviction for second degree murder are set forth in L.R.S. 14:30.1 which provides in pertinent part:
Second degree murder is the killing of a human being:
(1) When the offender has a specific intent to kill or to inflict great bodily harm; or
(2) When the offender is engaged in the perpetration or attempted perpetration of aggravated rape, aggravated arson, aggravated burglary, aggravated kidnapping, aggravated escape, armed robbery, or simple robbery, even though he has no intent to kill or to inflict great bodily harm.
Since the trial court itself concluded that there was no evidence of an armed robbery, it is quite clear that subsection (2) above does not apply. Therefore, it is the burden of the State to prove: 1) the killing of a human being; and 2) the specific intent to kill or inflict great bodily harm.
On appeal, it is the contention of each defendant that the State failed to prove the requisite specific intent to kill or inflict great bodily harm. Specific criminal intent exists when the circumstances indicate that the defendant actively desires the prescribed criminal consequences to follow his act. L.S.A.-R.S. 14:10(1). Specific intent need not be proven as fact, but may be inferred from the circumstances of the transaction and the actions of the defendant. The existence of specific intent is an ultimate legal conclusion to be resolved by the fact finders. The reviewing court's task is to determine whether the evidence, both direct and circumstantial, when viewed in the light most favorable to the prosecution, is sufficient to allow a rational trier of fact to conclude that the defendant had the specific intent to kill or inflict great bodily harm beyond a reasonable doubt. State v. Edge, 504 So.2d 1169 (La.App. 5 Cir.1987).
In the present case, the evidence adduced at trial places only one black male at the scene of the murders. Although it is uncertain which defendant did the shootings it can be assumed that at least one of the defendants was convicted pursuant to the principals doctrine. Principals are defined as "all persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime." R.S. 14:24. Persons who aid and abet in the commission of the crime are guilty as principals although they do not directly commit the act constituting the offense. State v. Bernard, 441 So.2d 817 (La.App. 3 Cir.1983) writ den. 445 So.2d 439 (La.1984). In order to be convicted as a principal to a crime, the State must prove more than mere presence at the crime scene. In State v. Holmes, 388 So.2d 722, 726 (La.1980), the Court noted:

*552 However, under R.S. 14:24, not all principals are automatically guilty of the same grade of offense. One who aids and abets in the commission of a crime may be charged and convicted with a higher or lower degree of the crime, depending upon the mental element proved at trial. State v. McAllister, 366 So.2d 1340 (La.1978). Thus, an individual may only be convicted as a principal for those crimes for which he personally has the requisite mental state. In the case of a first degree murder conviction, the requisite mental state is that the defendant had the specific intent to kill. It is not enough to find merely that his coconspirator or accomplice had the necessary mental state, since this intent cannot be inferred to the accused. It must be shown that this accused also had the specific intent to kill. [emphasis added].
See also Flowers v. Blackburn, 779 F.2d 1115 (5th Cir.1986); cert den. Blackburn v. Flowers, 475 U.S. 1132, 106 S.Ct. 1661, 90 L.Ed.2d 204 (1986); State v. Tobias, 452 So.2d 157 (La.1984) and State v. Medford, 489 So.2d 957 (La.App. 5 Cir.1986).
Therefore, in this case, in order to sustain the convictions, the State must prove that each defendant had the requisite specific intent to kill or inflict great bodily harm. As to the defendant Ron Wiggins, the evidence adduced at trial established the following:
1) On February 16, 1986, in response to a phone call from Marta Rodriguez, Ron Wiggins went to the Snyder apartment in New Orleans for the purpose of effecting a drug deal.
2) Because the cocaine was at Jesus Gonzales' house in Gretna, the two groups then drove in their respective cars over the Mississippi River Bridge to the Canal Villere Supermarket at the intersection of Lapalco and Wall Boulevard in Gretna. Stopping in the supermarket parking lot, Snyder and his two companions told the Wiggins brothers to wait there while they went to Jesus Gonzales' house several blocks away to pick up the cocaine. When the three returned to the Canal Villere parking lot at approximately 8:05 p.m., Miguel Snyder and Jesus Gonzales, with the cocaine in hand, got into the green Cadillac with the Wiggins brothers to complete the drug transaction, telling Marta Rodriguez that they would be back in five minutes and to stay in the car. It appears that when the four left the parking lot, Ron Wiggins and Jesus Gonzales were sitting in the front seat, with Ron Wiggins driving. Joseph Wiggins was in the back seat on the driver's side behind his brother Ron, with Miguel Snyder sitting next to him on the passenger side.
3) Approximately five minutes after the Cadillac drove off, Marta Rodriguez, who was waiting for Snyder and Gonzales to return, saw three or four police cars speeding by, going in the same direction as the Wiggins' Cadillac. From the testimony of Marta Rodriguez, it appears the Cadillac had driven off in the direction of Jesus Gonzales' house. Within minutes after the four drove off together, Jesus Gonzales and Miguel Snyder were found dead from gunshot wounds.
4) Two disinterested witnesses testified that they had only seen one black man at the scene. Amelia McKay testified that she saw a black man get out of the front passenger door of a car parked across the street from her residence, go around to the back of the car, open the door and fire two shots. She then called the police who found the bodies of the two victims in the street. Warren Hotard testified that he observed, on his way to the grocery, a white male tugging at the doors of a car, parked alongside the road, in an apparent attempt to get inside the car. He also noticed a second white man sitting in the back seat and one black male in the front. On his way home from the grocery, he saw the two bodies lying in the street.
5) When the Wiggins' Cadillac was located, the police found bullet fragments lying on the inside of the car, in addition to blood stains and a speed loader. The blood stains were found to be consistent with the blood groupings of Miguel Snyder and Jesus Gonzales. Also, a fingerprint found on one of the bullets in the speed loader was identified as that of Ron Wiggins.
*553 6) There was testimony by Louise Braun, a firearms expert, that the two victims were killed by the same gun and the bullets found in the speed loader were consistent with the type used to kill the two victims.
7) It should also be noted that prior to the seizure of the Wiggins' Cadillac on March 7, 1986, Ron Wiggins had surrendered and was arrested. However, the circumstances surrounding his surrender and arrest cannot be ascertained from the present record.
As to the defendant Joseph Wiggins, the following evidence was adduced at trial:
1) Joseph Wiggins accompanied his brother Ron Wiggins to the Snyder apartment on February 16, 1986.
2) For sequence of events following this and Joseph Wiggins' involvement, see previous evidence relating to Ron Wiggins.
3) The Wiggins' Cadillac was located by the police in a body shop in New Orleans for the purpose of being repaired and repainted. It was Joseph Wiggins who brought the Cadillac to the repair shop and who subsequently brought someone to pick up the Cadillac when the work was done.
The facts listed above indicate the existence of specific intent. Although Amelia McKay and Warren Hotard testified that they saw only one black male, there is no evidence within five minutes after leaving Marta Rodriguez at the Canal Villere parking lot that the Wiggins Brothers separated. Throughout the entire night the Wiggins brothers had been together in the green Cadillac.
Considering the testimony and evidence presented, the jury could reasonably conclude that the Wiggins brothers were together and both had the specific intent to kill the two victims. During this entire "drug deal" the Wiggins brothers acted in concert and viewing the evidence in the light most favorable to the prosecution, it is reasonable to conclude as the jury did here, that they were together and acted together in killing the victims. Furthermore, there is no evidence presented whatsoever that would indicate otherwise.
This assignment lacks merit.
ASSIGNMENTS OF ERROR RELATING TO JOSEPH WIGGINS
ASSIGNMENT OF ERROR NUMBER 1
The evidence was insufficient to support appellant's conviction.
ASSIGNMENT OF ERROR NUMBER 2
The trial court erred in denying appellant's challenge for cause against a prospective juror.
These assignments lack merit. (See previous consideration; Assignments of Error Nos. 4 and 2 of Ron Wiggins).
ASSIGNMENT OF ERROR NUMBER 3
Also assigned as error are any and all errors patent on the face of the record.
ARGUMENT
La.C.Cr.P. art. 920 provides "the following matters and no others shall be considered on appeal: (1) An error designated in the assignments of errors; and (2) An error that is discoverable by a mere inspection of the pleadings and proceedings and without inspection of the evidence."
For the purpose of an error patent to review the "record" in a criminal case includes the caption, the time and place of holding court, the indictment or information and the endorsement thereon, the arraignment, the plea of the accused, the bill of particulars filed in connection with a short form indictment or information, the mentioning of the impaneling of the jury, the minute entry reflecting sequestration in a capital case, the verdict and the judgment or sentence. See State v. Oliveaux, 312 So.2d 337 (La.1975) and State v. Gordon, 504 So.2d 1135 (La.App. 5th Cir.1987).
A review of the record reflects that the trial court failed to wait twenty-four hours after the denial of the defendant's Motion for New Trial before sentencing. Although the defendant, Ron Wiggins waived this delay, there is no indication in the record that his co-defendant waived this delay. However, such error is harmless unless prejudice is shown by the defendant. State v. Gamble, 504 So.2d 1100 (La.App. *554 5th Cir.1987). As the defendant, Joseph Wiggins made no showing of prejudice in this case, the error is harmless. Accordingly, this assignment lacks merit.

CONCLUSION
Finding none of Ron Wiggins' or Joseph Wiggins' assignments of error to have merit, we affirm their conviction and sentence.
AFFIRMED.