461 So.2d 1118 (1984)
STATE of Louisiana
v.
Curtis WILLIAMS.
No. 84-KA-123.
Court of Appeal of Louisiana, Fifth Circuit.
December 11, 1984.
*1120 Harry J. Morel, Dist. Atty., Gregory C. Champagne, Asst. Dist. Atty., Twentyninth Judicial District Court, Hahnville, for plaintiff-appellee.
Ralph E. Tyson, Edselle K. Cunningham, Baton Rouge, for defendant-appellant.
Before BOUTALL, KLIEBERT and DUFRESNE, JJ.
KLIEBERT, Judge.
On January 19, 1984, the defendant, Curtis Williams, Sr., was charged by grand jury indictment with one count of first degree murder (R.S. 14:30) in connection with the deaths of Kenneth Norman and Cathleen Harrell. The district attorney subsequently amended the indictment to charge two counts of first degree murder. After preliminary motions, which included two motions to suppress, were filed and disposed of, the case was tried before a jury of twelve people on October 11-14, 1983. At the conclusion of the trial, the twelve member jury unanimously found the defendant guilty of both counts of first degree murder. After the sentencing phase of the trial, and acting upon the jury's recommendation, the trial judge sentenced the defendant to life imprisonment without the benefit of parole, probation, or suspension of sentence. It is from this conviction and sentence that the defendant appeals. After a careful review of the record we vacate in part, affirm in part and remand the case to the trial court.

FACTS
On December 26, 1982, the defendant and both victims left Baton Rouge, Louisiana in the defendant's pick-up truck. Sometime between 8:00 a.m. and 9:00 a.m. on the same day, Deputy Sheriff W.L. Kinchen, of the Livingston Parish Sheriff's Office, stopped the defendant's truck as it was traveling eastbound on Interstate Highway 10 in St. Charles Parish, because it was weaving in and out of the traffic lanes of the interstate. Deputy Kinchen spoke briefly to the driver of the truck (the defendant) and noticed the male and female passengers in the truck.
Although he believed the driver of the truck was too intoxicated to continue driving, Deputy Kinchen did not arrest the defendant because he was in the process of transporting a person to a hospital in an emergency situation. After instructing the defendant to discontinue driving, the officer returned to his patrol car, notified local police of the truck's location, and proceeded on to his destination.
At approximately 9:15 a.m., Trooper Mark Bascle of the Louisiana State Police received reports that two persons were apparently sleeping on the shoulder of I-10. Trooper Bascle proceeded to the scene where he discovered the victims, apparently shot to death, lying face down along the railing located in the emergency lane next to the eastbound lanes of Interstate 10 in *1121 St. Charles Parish. The male victim was identified as Kenneth Norman and the female victim was later identified as Cathleen Harrell.
Detective Sam Zinna of the St. Charles Parish Sheriff's Office was assigned to investigate the deaths. Detective Zinna drove to Baton Rouge to inform Harrell's family of her death. Statements by her family revealed that Harrell and Norman had left Baton Rouge that morning in a truck driven by Curtis Williams, Sr., the defendant. Detective Zinna obtained descriptions of Williams and his truck.
On December 27, 1982, Deputy Kinchen learned of the discovery of the bodies and contacted the St. Charles Parish Sheriff's Office. Deputy Kinchen described the truck and driver whom he had stopped on December 26, 1982. As a result of this, on December 28, 1982, Detective Zinna drove to Livingston Parish and showed a photo lineup, containing five photographs, to Deputy Kinchen. Deputy Kinchen identified Curtis Williams, Sr. as the driver of the truck which he had stopped on the interstate highway two days before.
Detective Zinna thereafter secured a warrant for the arrest of Curtis Williams, Sr. in connection with the deaths of Norman and Harrell. On December 31, 1982, Williams was discovered at the Big Six Motel in Port Allen, Louisiana and was arrested without incident by the Port Allen Police Department.

ASSIGNMENT OF ERROR NO. 1
In his first assignment of error, the defendant argues the trial court's denial of the defendant's motion to suppress an inculpatory statement and physical evidence obtained as a result of the statement was error which was compounded when on trial the court allowed the physical evidence to be introduced without the introduction of the statement.
After his arrest, the defendant was taken to the Port Allen jail. Initially, the defendant signed a rights form indicating he did not wish to make a statement without the presence of an attorney. Approximately one hour later, as Detective Zinna was explaining to the defendant's girlfriend (Catherine Tucker) the nature of the charges filed against the defendant, the defendant began to make a statement which Detective Zinna believed might be incriminating, hence, he stopped him and again advised the defendant of his rights. At this time, the defendant initialed another rights form, waiving his rights to an attorney, and then made an oral statement which Detective Zinna transcribed. The transcription, which was initialed by the defendant and initialed for identification by Catherine Tucker and the defendant's son, Curtis Williams, Jr., was as follows:
"Seen Cathleen about 5:30 or 6:00 a.m., Sunday morning. Was talking to Cathleen and another black male subject at Cathleen's residence when deciding to go to N.O. Left to go to N.O. While driving, the subject stated that he wanted to take his truck. The subject ask me to stop, so that he could P. When being stopped, he and the subject started fighting because the subject wanted to take his truck. While fighting, went back to his truck and got the gun from the center console. Shot both subjects who were outside the truck. Stated that Cathleen was involved in the fight. Shot Cathleen three times. Shot the other subject twice. Does not know the other subject. After the shooting went to Kenner to see his cousin Coreen Cooper. Told Coreen what he did. Left Kenner shortly after seeing Coreen and came back to Baton Rouge. Rented room at Motel Six in Port Allen. Acknowledged that gun turned in by his son was the weapon used in the murder. Has not been at work since the shooting."
Following a pre-trial hearing the court denied the defendant's motion to suppress the statement. Nevertheless, at the trial the state made no attempt to introduce the statement into evidence. Now, the defendant contends that his gun and photographs of his truck which were introduced into evidence should not have been allowed as evidence because they were the fruits of an *1122 illegally obtained statement. Thus, the assignment of error raises two issues: (1) Was the statement taken from the defendant legally taken, and (2), if not, were the truck and gun "fruits from the forbidden tree"?
An accused, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communications, exchanges or conversation with the police. Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). When an accused asserts his right to counsel, the police must "scrupulously honor" the invocation of the right and the interrogation must cease. State v. Thucos, 390 So.2d 1281 (La.1980); State v. Manning, 380 So.2d 46 (La.1980). In State v. Foley, 448 So.2d 731 (La.App. 5th Cir.1984), at page 735, while paraphrasing other cases we said:
"The question of whether an accused's rights are "scrupulously honored" depends on the totality of the circumstances involved in the particular facts of each case. Factors to be considered are the time lapse between the request for counsel and the subsequent interrogation, whether Miranda warnings were given between each separate interrogation, whether waiver of right forms were signed and whether pressures were asserted on the accused by the police between the time he invoked his right to counsel and the subsequent interrogation. State v. Shea, 421 So.2d 200 (La. 1982); State v. McCarty, 421 So.2d 213 (La.1982).
In the present case the defendant was advised of his rights and indicated he knew them. While Williams could not read he could and did first sign a rights form indicating he did not wish to make a statement without the presence of an attorney, and a little over an hour later he initialed a rights form waiving his right to have an attorney present.
According to the testimony of Detective Zinna, he made no attempts to initiate further conversation with Williams after the first rights form had been executed. On the other hand, Williams testified that after he executed the first rights form Detective Zinna remained in the room with him and "asked him about twice" for a statement. The defendant further testified that "After Catherine come in, then I decided, IWell, I didn't know what would happen after I get down this way because I ain't never been down this way. So, I decided, well, I might as well go on and tell him what happened." Williams further testified that Zinna did not threaten him or induce him in any way to sign the waiver form.
It is well established that nothing in Miranda prevents an accused party from changing his mind and giving a statement after he has previously declined to do so, so long as the statement is voluntary and intelligently made. Michigan v. Mosley, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975); State v. Knowles, 444 So.2d 611 (La.1984).
We find that the totality of the circumstances supports the trial judge's conclusion that Detective Zinna did not initiate further interrogation with the defendant after Williams refused to give a statement and that the statement was voluntarily and knowingly made.
Although there is some conflict as to how the police came into possession of the defendant's gun, we also find that the defendant's gun and photographs of his truck were not obtained as a result of the statement made by the defendant but were independently obtained by the police.
Detective Zinna testified at the motion to suppress and at the trial that the defendant's son, Curtis Williams, Jr., voluntarily turned the gun (a .38 caliber revolver which was determined by ballistics tests to have been the same gun which fired the bullets into both victims) over to him. All agree Williams Sr. called Catherine Tucker and instructed her to get Williams Jr. to bring in the gun. The important question *1123 is whether the call was made before or after the statement was given. The defendant Williams' testimony did not contradict the testimony of the detective on this question. Rather, Williams, using a series of "I think", "I believe" and "I don't remember" neither agreed nor disagreed with the detective.
Further, the detective's testimony on the motion to suppress clearly indicates the gun was given to him prior to the defendant making the statement. His testimony is further corroborated by the statement itself[1] which refers to the fact that the defendant acknowledged the gun turned in by his son was the weapon used in the murders. This supports the conclusion that the weapon had already been turned in at the time the statement was made.
The pictures of the truck were taken after the truck was taken from the motel to the police garage. On the motion to suppress, Detective Zinna testified that before the defendant gave the inculpatory statement he had consented to have his truck towed to the police garage and his son, Curtis Williams, Jr., accompanied a police officer to the motel where the defendant had been arrested to bring the truck in. No testimony contradicts or refutes this explanation as to how and when the truck was obtained.
The defense contends the tow permit signed by Williams was inculpatory in nature and completed after he had invoked a right to counsel; therefore, the truck was obtained by means of an illegally obtained statement. Even if that were the case, it appears the truck was of such a nature and in such a location as to be "inevitably discovered" by the police and therefore exempt from the exclusionary rules provisions. Nix v. Williams, ___ U.S. ___, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984).
We therefore conclude that the gun and photographs of the defendant's truck were legally obtained independently of the defendant's statement and properly admitted into evidence; the gun because it was voluntarily surrendered before the statement was made, and the truck for the same reasons, plus the fact its discovery was inevitable.

ASSIGNMENT OF ERROR NO. 2
In his second assignment of error, the defendant contends the trial court committed reversible error when, during trial, the court overruled defense objections to the admissibility of the "protocols" of the autopsy (which included a diagram of a female body and notations indicating bullet entry and exit wounds).
The assistant coroner, Dr. Richard Tracy, an expert in the field of pathology, testified that he performed the autopsy on both of the victims. According to Dr. Tracy's testimony, the questioned autopsy protocols were typewritten transcripts of the autopsy findings as dictated by him. The "autopsy protocol" on Cathleen Harrell refers to an accompanying diagram showing the reconstructed courses of presumed paths of bullets found in the victim. This diagram was also prepared by Dr. Tracy. The trial judge admitted the protocols and diagrams over counsel for defendant's objection.
At the trial and here, the state contends the protocols were in fact "autopsy reports" and as such admissible in evidence under C.Cr.P. Article 105. The defendant contends the autopsy protocols should have been excluded as hearsay evidence because they were not a coroner's report or a proces verbal of a coroner's report, hence, it did not fall within the exception to the hearsay rule. Code of Criminal Procedure Article 105 and the jurisprudence formed thereunder established an exception to the hearsay rule. A coroner's report and proces verbal are admissible into evidence in criminal proceedings as evidence of death and the cause thereof, *1124 but not of any other fact. Louisiana Code of Criminal Procedure Article 105; State v. Kelly, 375 So.2d 1344 (La.1979); State v. Monroe, 345 So.2d 1185 (La.1977). The report and proces verbal may be introduced into evidence and testified to by the coroner or one of his assistants even if they had not actually performed the autopsy on the victim. State v. Kelly, supra; State v. Berry, 324 So.2d 822 (La.1976); State v. Holmes, 258 La. 221, 245 So. 707 (1971).
The defense further contends that although considered as a coroner's report and hence admissible under Code of Criminal Procedure Article 105, the protocols were improperly used to bolster the state's theory of how the victims were shot as support for the state's contention the shootings were murder and not justifiable homicide, rather than to prove merely the fact and proof of death as contemplated by Article 105. The latter contention is unfounded. Dr. Tracy used the assistant district attorney as a model when he gave his oral testimony as to the positions of the victims when shot, the paths of the bullets through the victims' bodies, and the entry and exit wounds found on the bodies of the victims. No reference was made to the protocols during the course of establishing how the victims were shot.
Although Code of Criminal Procedure Article 105 and the jurisprudence formed thereunder establishes an exception to the hearsay rule, it is not, however, the only basis or method for the introduction of the coroner's report or a proces verbal of an autopsy. Where, as here, the particular doctor who made the report is the one testifying the proof and cause of death can be established by any competent evidence. Since the protocols and diagram were made by Dr. Tracy and merely corroborated his court-given testimony, it was not error to admit them in evidence.

ASSIGNMENT OF ERROR NO. 3
In the third assignment of error, the defendant urges reversible error because the trial court denied the defendant's motion for a mistrial based upon the in-court identification of the defendant made by Deputy Kinchen. In substance, according to the defendant, the jury was unable to judge Deputy Kinchen's credibility because the jury was not shown the photographic lineup which Deputy Kinchen had been shown to identify the defendant as the person who was driving the truck which he had stopped on the day of the shooting.
Shortly after the victims' bodies were discovered and Detective Kinchen had called the St. Charles Parish Sheriff's Office to convey his knowledge of the incidents he was aware of, he was shown a photo lineup from which he identified the defendant as the driver of the truck he had stopped two days before at the place the victims' bodies were found. The defendant filed a motion to suppress the photographs used in the photo lineup on the grounds the lineup was overly and hence impermissibly suggestive. The motion also sought to suppress any eye-witness testimony of Deputy Kinchen on the grounds such testimony was tainted by the use of the improperly suggestive photo lineup. The motion was denied by the court.
At the trial, Deputy Kinchen positively identified the defendant as the driver of the truck he had stopped on December 26, 1982 and admitted his identification was based upon the pre-trial photographic lineup which he had viewed. Since the state did not introduce the pictures which were used in the photo lineup, the defendant filed a motion for a mistrial and now contends the trial judge committed reversible error when it denied the motion because the jury was denied the opportunity to assess the credibility of Deputy Kinchen.
Each side has the right to impeach the testimony and credibility of every witness sworn on behalf of the other side. LSA-R.S. 15:486. In this case, defense counsel had full opportunity to cross-examine Deputy Kinchen in order to attack Deputy Kinchen's credibility and his testimony relating to the in-court and out-of-court identification of the defendant. Once Deputy Kinchen *1125 testified as to his identification of the defendant, it was for the jury to determine the weight to be given to his identification of the defendant. State v. Sterling, 205 La. 879, 18 So.2d 327 (1944). The state had no duty to introduce the photo lineup in evidence.
Additionally, we note this case is not one where identification of the accused is a contested issue. The defense asserted in its opening arguments that the defendant killed the victims in self-defense. Two other witnesses testified that they saw both victims leave Baton Rouge with the defendant in the defendant's truck on the morning of the same date that the victims were killed. The defendant himself testified that he shot the victims. Therefore, we find no error in the denial of the defendant's motion for mistrial.

ASSIGNMENT OF ERROR NO. 4
In the fourth assignment of error, the defendant contends the trial court erred when it denied the defendant's motion for post-judgment verdict of acquittal and his motion for a new trial.
By this assignment, the defendant contends the state's evidence was insufficient to establish the homicides were not committed in self-defense.
LSA-R.S. 14:20, in pertinent part, reads as follows:
"A homicide is justifiable:
(1) When committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger....
Once the issue of self-defense is raised by the defendant, the state has the entire and affirmative burden of proving beyond a reasonable doubt that the homicide was not perpetrated in self-defense, or in a purely circumstantial case, the state has the burden of proving to the exclusion of every reasonable hypothesis that homicide was not committed in self-defense. LSA-R.S. 15:438; State v. Patterson, 295 So.2d 792 (La.1974); State v. Brown, 414 So.2d 726 (La.1982); State v. Savoy, 418 So.2d 547 (La.1982); State v. Stevenson, 447 So.2d 1125 (La.App. 1st Cir.1984).
Here the jury has already decided the state has met that burden. Hence, our inquiry is limited to the questions of whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the evidence excluded every reasonable hypothesis the homicides were not committed in self-defense and thus support a finding the defendant was, beyond a reasonable doubt, guilty of murder. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Moody, 393 So.2d 1212 (La.1981).
According to the defendant's version, when he and Kenneth Norman were urinating on the side of the interstate, he heard one of the victims say "Let's get him." He further testified that the victims then grabbed him in an effort to throw him over the railing into the water located below the elevated portion of the highway. When he got away from the victims, he ran around the back of his truck to the driver's side, retrieved his .38 caliber revolver from the inside of his truck under an arm rest in the seat, continued to run around the front of the truck towards the railing along the highway, and then turned around and started shooting at the victims as they were running towards him.
Under his version, although he knew both victims were unarmed, he did not verbally warn the victims to stop their advance towards him, nor did he fire any warning shots prior to shooting the victims. He also testified he did not believe the victims saw him get the gun and did not know why he didn't continue running down the highway rather than shooting the victims.
After the shooting, the defendant got in his truck and fled the scene. He went to his cousin's house in Kenner, Louisiana and said to her "they tried to use me, they tried to use me." He then left Kenner and went to Baton Rouge, Louisiana, and shortly *1126 thereafter went to Port Allen where he checked into a motel room. The defendant was later arrested at the motel in Port Allen on December 31, 1982 (five days after the shooting).
The autopsies proved that the victims had been shot to death. Ballistics tests proved that the fatal shots were fired by a gun purchased by the defendant. Dr. Tracy, the assistant coroner who performed the autopsies, testified that Kenneth Norman had sustained four wounds from two bullets. According to his testimony, one bullet entered through the back of Norman's left hand and re-entered his right leg and the other bulletthe fatal shotentered the outer aspect of the right arm and passed through his chest. Dr. Tracy testified that Cathleen Harrell sustained nine wounds of entry and exit caused by at least three bullets. One bulletthe fatal shot entered the right side of her chest under her arm. Another bullet entered the left side of her back in the region of the kidney and existed in front, about mid-abdomen.
In considering a self-defense claim, it is necessary to consider whether the defendant had a reasonable belief he was in imminent danger of losing his life or receiving great bodily harm and whether the killing was necessary, under the circumstances, to save the defendant from that danger. State v. Bailey, 261 La. 831, 261 So.2d 583, 584 (1972). Although there is no unqualified duty to retreat, the possibility of escape is a factor in determining whether or not a defendant had the reasonable belief that deadly force was necessary to avoid the danger. State v. Brown, 414 So.2d 726 (La.1982). State v. Freeman, 447 So.2d 1145 (La.App. 3rd Cir.1984). The defendant's flight is another factor to be considered in weighing the probabilities for or against the defendant's guilt. State v. Burge, 359 So.2d 616 (La.1978).
In the case at bar, assuming the defendant's testimony to be truthful, the defendant was able to struggle free from the initial confrontation which he testified took place between himself and the victims. The defendant then went to his truck and, instead of driving away at that point (the defendant testified that he had left the key in the ignition of the truck while he and Norman were urinating along the highway), the defendant armed himself with a loaded gun and proceeded to further retreat. He then turned around and, without firing any warning shots or giving any verbal warnings, unloaded all five bullets in his revolver into the unarmed victims. Although the defendant testified that he shot the victims as they were running towards him, Dr. Tracy's testimony proved that the victims were hit by the bullets from their sides and that one bullet entered the back of Cathleen Harrell.
After a careful consideration of all of the state's evidence we conclude any reasonable trier of fact could have concluded that the state has carried its burden that the homicides were not in self-defense.

ERROR PATENT
The defendant was charged by bill of indictment with two counts of first degree murder. Although the form of indictment, i.e., first degree murder of Kenneth Norman and first degree murder of Cathleen Harrell was, under the provisions of Article 465 of Code of Civil Procedure, sufficient indictments, the evidence before us is not sufficient to support a conviction of two counts of first degree murder. Under the evidence presented to the jury in this case, the only provision of R.S. 14:30 which could be used to support a conviction of first degree murder is Part 3 of that statute which applies when the offender had a specific intent to kill or inflict great bodily harm upon more than one person. Here Williams' intent to kill Norman was used to enhance the killing of Harrell to first degree murder. Then Williams' intent to kill Harrell was used to enhance the killing of Norman to first degree murder. Thus, Williams was convicted and sentenced on both first degree murder indictments.
In State v. Steele, 387 So.2d 1175 (La. 1980), the supreme court at page 1177 said:

*1127 "If the evidence required to support a finding of guilty of one crime would also have supported conviction of the other, the two are the same offense under a plea of double jeopardy, and a defendant can be placed in jeopardy for only one...."
* * * * * *
"the central idea being that one should not be punished (or put in jeopardy) twice for the same cause of conduct."
On this premise in State v. Cotten, 438 So.2d 1156 (La.App. 1st Cir.1983) a conviction of first degree murder was held to preclude an indictment for attempted armed robbery arising from the same event. The theory for the doctrine is that since the defendant has already been punished for the felony as that was a major element of a felony murder conviction, he cannot be tried for the felony itself. See State v. Stewart, 400 So.2d 633 (La.1981).

CONCLUSION
Under the evidence presented here, the double jeopardy doctrine prohibits a conviction of Williams on two counts of first degree murder because the only first degree murder he can be convicted of under R.S. 14:30(3) requires the showing of an intent to kill more than one person. Accordingly, we vacate the defendant's conviction of the first degree murder of Cathleen Harrel, but let stand the conviction and sentence of Williams to the first degree murder of Kenneth Norman and, pursuant to the holding in State v. Thomas, 427 So.2d 428 (La.1982), remand the case to the trial court to correct any entry on conviction of Williams on count two, i.e., first degree murder of Cathleen Harrell.
VACATED IN PART; AFFIRMED IN PART; AND REMANDED.
NOTES
[1] Although there was some discussion that the initials placed on the second rights form were different from the initials on the first form, there is no dispute as to the accuracy of the transcribed statement. Further, the defendant, Catherine Tucker and Curtis Williams, Jr. all initialed each page of the transcription.