596 So.2d 1372 (1992)
STATE of Louisiana
v.
Israel James DUCRE.
No. 90 KA 2228.
Court of Appeal of Louisiana, First Circuit.
March 6, 1992.
Writ Denied June 19, 1992.
*1374 William R. Campbell, Jr., New Orleans and David J. Knight, Asst. Dist. Atty., Covington, for the State.
Reginald J. Laurent, Slidell, for defendant.
Before SHORTESS, LANIER and CRAIN, JJ.
SHORTESS, Judge.
Israel Ducre (defendant) was charged by grand jury indictment with second degree murder, LSA-R.S. 14:30.1. He pled not guilty and, after trial by jury, was found guilty as charged. He received the mandatory sentence of life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. Defendant has appealed, alleging six assignments of error, as follows:
1. The trial court erred in allowing the prosecutor to exclude black prospective jurors without explanation.
2. The trial court erred in excluding evidence of the victim's prior criminal record and violent propensity.
3. The trial court erred in denying the defendant's motion for new trial.
4. The trial court erred in allowing a state expert witness who did not perform the autopsy to testify concerning the victim's cause of death.
5. Errors were committed which are patent on the face of the record.
6. The evidence was insufficient to support the instant conviction.
Assignments of error numbers one and five were not briefed on appeal and, therefore, are considered abandoned. Uniform *1375 RulesCourts of Appeal, Rule 2-12.4.[1]

FACTS
Shortly before midnight on February 17, 1989, defendant shot and killed the victim, Jerome Pierre, inside the Morocco Lounge in Lacombe, Louisiana. Approximately twenty minutes before the shooting occurred, defendant and the victim engaged in a heated argument outside the bar. After this argument, defendant left in his car, and the victim went inside the bar. When defendant returned, he entered the bar, pulled a gun, and shot the victim one time in the chest at close range. At the trial, there was conflicting testimony as to which man approached the other inside the bar, whether they were arguing when the shooting occurred, and whether the victim possessed a gun.
Barbara Batiste testified that she witnessed the argument outside the bar between defendant and the victim; that both men were cursing; that the argument lasted approximately ten minutes, but no blows were exchanged; that she did not know who started the argument; that when the argument ended, defendant left in his car and the victim went inside the bar; that when defendant returned, he entered the bar and shot the victim; that after the shooting, defendant kicked the victim and then walked out the door; and that she did not see anyone else inside the bar with a gun.
Coradena Landor testified that before the shooting, neither defendant nor the victim appeared intoxicated; that she was inside the bar and heard a shot; that she turned and saw the victim on the floor; that defendant was standing over him holding a gun; that defendant kicked the victim twice in the chest, turned to the crowd and said, "Anybody else?"; that defendant then left the bar holding the gun; and that she did not see the victim with a weapon.
Valerie Gousman testified that she operated the Morocco Lounge; that on the night of the shooting, the victim did not appear to be intoxicated; that she was working behind the bar when she heard the shot; that she saw defendant kicking someone, looked over the bar, and saw the victim on the floor; and that she assisted Lisa Ordogne, Morris Batiste, and Dewon Vander in rendering first aid to the victim. She testified that she did not see anyone recover a weapon from the victim; that she was only a few feet across the bar from the victim and did not observe a fight or argument immediately preceding the shooting; and that after the shooting, she heard defendant say to the victim, "Is that what you wanted?" and then leave as she went to call the police.
Lisa Ordogne testified the victim did not appear intoxicated on the night of the shooting. She testified that she witnessed the argument outside between defendant and the victim; that both men cursed each other during this argument, which lasted approximately ten minutes; that the victim was doing most of the yelling; that when the argument ended, defendant left in his car and the victim went inside the bar; that approximately fifteen to twenty minutes later, defendant returned; that when she saw defendant return, she told the victim; that she asked the victim to dance with her; that he declined, explaining he had to watch defendant instead; that defendant walked past the victim, stopped, turned toward him and said, "Come here, man"; that the victim refused; that defendant pulled a gun and said, "This is what you want"; that at that moment, defendant shot the victim; that the victim did not make any aggressive or threatening moves toward defendant; that no argument took *1376 place and no blows were exchanged immediately before the shooting; that after the victim fell to the floor, defendant kicked him in the chest; that defendant then held up his gun and hollered, "Anyone else?"; that defendant then left the bar carrying the gun; and that she did not see the victim with any weapon, nor did she see anyone take a weapon from the victim's body.
On cross-examination and redirect examination, Ordogne explained why she believed the victim had a gun that evening. When defendant left in his car, Ordogne approached the victim and told him she believed defendant was going to get a gun. The victim replied, "Don't worry about it. I got (sic) something for him." Because of this reply, Ordogne concluded the victim had a gun. However, when she asked to see the victim's gun, he replied, "No." Ordogne testified she never knew the victim to carry a gun. On the night of the shooting she did not see him with a gun or any other weapon, nor did she see a bulge in his back pocket.
Morris Batiste testified that he heard a shot as he was entering the bar; that he saw the victim on the floor and defendant standing over him with a gun in his hand; that defendant kicked at the victim and then hollered, "Who (sic) next?"; that defendant left the bar with the gun in his hand; that he did not see a weapon of any kind on the victim's body; and that he never knew the victim to carry a weapon.
Kevin Atkins testified that the victim told him about the argument which occurred outside the bar and stated that, during the argument, defendant threatened to kill him; that when he asked the victim if he had a gun, the victim replied he did not; that the victim raised his shirt to show Atkins he did not have a weapon hidden in his waistband; that the victim did not appear intoxicated; that when defendant returned, he walked into the bar, passed the victim, turned around, and exchanged words with the victim; that defendant said, "You want it? You want it?"; that defendant pulled a gun out of his pocket and shot the victim; that although defendant and the victim were arguing when the shooting occurred, they were not fighting; that the victim used no force or violence immediately before the shooting; that after the shooting, defendant kicked the victim, who was lying on the floor; that defendant then turned to the crowd and asked if anybody else "wanted it" before leaving the bar with the gun; and that he did not see anyone take a weapon from the victim.
Dewon Vander testified that she had lived with the victim; that he was the father of her little girl; that they separated approximately four months before the shooting; that they were still friends; that she was outside the bar at the time of the shooting; that after the shooting, she and several others approached the victim and rendered first aid; that she looked in the victim's pocket for his wallet with the intention of giving it to his family, but the victim did not have a wallet; that she did not see a weapon on the victim; and that she had never known him to carry a gun.
Margaret Batiste was inside the bar when the shooting occurred. She testified that she heard defendant say in a loud voice, "You want it? You want it? Come and get it. Come and get it." She further testified that she turned and saw the victim approaching defendant; that although the victim was moving his hands, she did not see anything in them; that she then heard a shot and saw the victim fall; that after the shot, something, perhaps gunpowder, was in her eyes; and that by the time she wiped her face and eyes, defendant was gone.
Estevan Williams testified that he was working as a bartender at the Morocco Lounge with Gousman on the night the shooting occurred; that as he passed a drink across the bar to the victim, he heard defendant say, "I have something for you and I'm going to give it to you"; that when the victim turned toward defendant, defendant fired; that blood spattered on Williams' face and shirt; that he looked *1377 over the bar and saw the victim on the floor; that defendant was standing over the victim and kicking him; that defendant said, "Who else wants some?"; that there was no reply; and that defendant then walked out of the bar carrying the gun.
After the shooting, St. Tammany Parish Sheriff's deputies searched for defendant at his apartment, his parents' home, and several local bars without success. At trial, Lonnie Laurent testified that he gave defendant a ride a short distance to defendant's apartment at approximately midnight; that when defendant entered his car, he had a gun; and that defendant said he needed to get out of town because he had shot a man and the police would be looking for him.
Defendant surrendered at the Slidell Sheriff's Office Annex at approximately 8:00 a.m. on February 18, 1989. He made a brief statement indicating he shot the victim because "[t]he dude kept jumping on me. He just kept jumping on me." When asked about the gun, defendant stated he left it in the bar.
Harold Lewis, Jr., testified he was standing at the bar with defendant when the victim approached and said something to defendant which Lewis could not hear. Lewis turned and walked away. A few minutes later, Lewis heard the shot but did not see it. When people started running outside, he followed them and did not see what defendant did after the shooting.
Kendall Ducre testified that he saw defendant and the victim arguing outside the bar but could not hear what they were saying; that this argument lasted twenty-five to thirty minutes; that after the argument, defendant walked away and went inside the bar; that he did not see defendant leave the bar in his car after the argument with the victim; and that after defendant went inside the bar, Ducre left the bar and went home. On cross-examination, Ducre admitted telling Detective David Hall on February 18, 1989, he was home the entire evening of the shooting.
Howard Lindsey testified that defendant and the victim were arguing inside the bar for at least twenty minutes before the shooting; that during this time, he walked in and out of the bar; that he heard the shooting but did not witness it; that when he looked at the victim on the floor, he saw Vander digging in the victim's pockets; that she recovered a gun from the victim's right back pocket; and that he did not see what Vander did with this gun.
Arthur Casnave testified that before the shooting defendant was at the bar; that the victim approached, hitting or pointing to his back left pocket and pointing in defendant's face; that he could not hear the argument because of the noise inside the bar; that while he stood by the pool table, he heard a shot fired but did not witness the shooting; that he saw the victim fall to the floor; that he then went outside with others; that he did not see what happened inside the bar after the shooting; and that he never saw the victim with any type of weapon that night.
David Ducre, defendant's brother, testified he was at the bar that evening but did not see the shooting; that after the shooting, he saw defendant leave the bar in his car; and that later defendant phoned him and asked about the victim's condition. Ducre further testified he told defendant that the victim was dead; that defendant replied he was going to surrender to the police; that he did not know where the call came from or if it was a long distance call; and that he did not know where defendant went after the shooting.
The defense then recalled Vander and Ordogne to the stand and asked them how the victim's brother, Zeezee Pierre, obtained the victim's gun. Both witnesses replied they were not aware Zeezee Pierre had a gun. Ordogne was also questioned about the relative positions of defendant, Lewis, and the victim before the shooting. She testified Lewis was standing beside defendant and the victim was to their left. Ordogne testified the victim did not move between Lewis and defendant.
*1378 On cross-examination, Ordogne explained a letter she had written to defendant. After the shooting, defendant wrote a letter to Ordogne's brother indicating that if anyone could say the victim had a gun, defendant would "walk free." Defendant also stated in the letter he hoped Lisa Ordogne was not mad at him because he could have been killed instead of the victim. Ordogne explained she did not understand this statement because she never observed the victim with a gun. However, she wrote a letter to defendant indicating that after the initial argument outside the bar, when defendant left in his car, the victim told her, "I got (sic) my shit." When asked if "shit" was slang for a weapon, Ordogne replied it could mean anything. Ordogne further explained she asked to see what the victim had but he refused to show it to her. She testified she asked to see "it," because if the victim had something she wanted to know what he had. However, she again testified she never saw the victim with a weapon that evening.
Margaret Batiste was also recalled to the stand and questioned as to the relative positions of defendant, Lewis, and the victim. She testified she did not remember where Lewis was standing. Defendant was standing next to her and yelling at the victim, who was approaching defendant. Although the victim was moving his hands, they were open, and she did not see anything in his hands.
Finally, the defense recalled David Ducre to the stand. He testified defendant and the victim were friends and were together practically every day. He also identified defendant and the victim in a photograph taken at Mardi Gras.
Defendant did not testify at the trial.
ASSIGNMENT OF ERROR NO. TWO:
Defendant contends the trial court erred in preventing him from introducing evidence of the victim's dangerous character. Specifically, defendant attempted to introduce evidence of the victim's violent reaction during a cocaine arrest and evidence of the victim's violent tendencies while under the influence of cocaine and/or alcohol. The prosecutor objected on the basis that an overt act had not been established. The trial court agreed and prevented the defense from introducing any evidence of the victim's dangerous character. Defendant contends he laid a proper foundation for the admission of evidence of the victim's dangerous character and, therefore, the exclusion of such evidence by the trial court constituted reversible error.
Louisiana Code of Evidence article 404 provides, in pertinent part:
A. Character evidence generally. Evidence of a person's character or a trait of his character, such as a moral quality, is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion, except:
* * * * * *
(2) Character of victim. (a) Except as provided in Article 412, evidence of a pertinent trait of character, such as a moral quality, of the victim of the crime offered by an accused, or by the prosecution to rebut the character evidence; provided that in the absence of evidence of a hostile demonstration or an overt act on the part of the victim at the time of the offense charged, evidence of his dangerous character is not admissible; ...
* * * * * *
B. Other crimes, wrongs, or acts. (1) Except as provided in Article 412, evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith.....
(2) In the absence of evidence of a hostile demonstration or an overt act on the part of the victim at the time of the offense charged, evidence of the victim's prior threats against the accused or the accused's state of mind as to the victim's dangerous character is not admissible;...
Evidence of the dangerous character of the victim is admissible only if the *1379 accused first produces evidence that at the time of the incident the victim made a hostile demonstration or committed an overt act against the accused of such character which would have created in the mind of a reasonable person a belief that he was in immediate danger of losing his life or suffering great bodily harm. State v. Jones, 451 So.2d 1181, 1185 (La.App. 1st Cir.1984). See also former LSA-R.S. 15:482. Once evidence of an overt act by the victim is established, evidence of threats and of the victim's dangerous character is admissible for two distinct purposes: (1) to show the defendant's reasonable apprehension of danger which would justify his conduct; and (2) to help determine who was the aggressor in the conflict. State v. Edwards, 420 So.2d 663, 670 (La. 1982). Once the defense has introduced appreciable evidence relevantly tending to establish the overt act, the trial court cannot exercise its discretion to infringe on the fact-determination function of the jury by disbelieving this defense testimony and, thus, deny the accused a defense permitted him by law. State v. Lee, 331 So.2d 455, 459 (La.1975).
In his brief to this court, defendant points to particular excerpts of the testimony of several state and defense witnesses in support of his proposition that the victim was armed with a gun, was the verbal aggressor in the argument, and made several different hand motions while approaching defendant, all of which allegedly constituted an overt act by the victim. One state witness, Ordogne, when called by the prosecution, testified she believed the victim had a gun. After the initial argument between defendant and the victim which occurred outside the bar, defendant got into his car and drove away. Ordogne approached the victim and told him that she believed defendant was going to get a gun. The victim replied, "Don't worry about it. I got (sic) something for him." Ordogne testified she never knew the victim to carry a gun. However, because of his reply, she concluded the victim had a gun. When she asked to see the victim's gun, he refused.
When called by the defense the following day, Ordogne testified she did not know if the "something" the victim had was a gun. Furthermore, Ordogne admitted she did not see the victim with a gun or any other weapon that night and she did not see a bulge in his back pocket. A defense witness, Howard Lindsey, testified that, after the shooting, he observed Vander retrieve a gun from the victim's right back pocket.
Citing the testimony of Lindsey and Ordogne referenced above, and noting the "appreciable evidence" rule announced in State v. Lee, the defendant initially concludes an overt act was established by the facts that the victim was armed with a gun and he was the verbal aggressor in the argument. We disagree. In State v. Cavalier, 421 So.2d 892 (La.1982), defense witnesses testified that after defendant shot the victim, a gun allegedly belonging to the victim was removed from his body by one of his cousins. However, all the state's witnesses testified the victim did not own a gun and did not have one when he was shot by defendant. The supreme court concluded that, even construing the evidence in the light most favorable to the defense, an overt act by the victim had not been established. The court concluded the victim getting up from the sidewalk and reaching behind his back into his waistband while approaching defendant was not an overt act. Of course, if the victim had actually retrieved a gun from the back of his waistband while walking toward defendant, an overt act would have been established. Applying the Cavalier decision to the instant case we conclude, even assuming the victim had a gun in his right back pocket, his approaching defendant while making certain hand gestures toward him during an argument is not an overt act.
In his brief, defendant also cites portions of the testimony of Margaret Batiste and Arthur Casnave. Referring to this testimony, defendant further concludes that the victim threatened to shoot him during the argument and actually drew first. However, we find such a conclusion totally unsupported *1380 by the record. Margaret Batiste testified she observed the victim "coming toward [the defendant]With his hands out like this (witness demonstrates)."[2] Based on this one excerpt of her testimony, defendant concludes the victim "drew first." However, defendant neglects to mention Batiste's testimony that she was looking at the victim and did not see anything in his hands. Referring to a portion of the testimony of Casnave, defendant concludes the victim was "threatening to shoot [defendant]." Casnave testified defendant was standing at the bar when the victim approached him. According to Casnave, the victim was hitting or pointing to his back pocket and pointing in defendant's face. Apparently, defendant concludes the victim's act of hitting or pointing to his back pocket constituted a threat he was going to shoot defendant. However, on cross-examination, Casnave testified the victim was hitting his back left pocket and pointing with his right hand. Lindsey's previous testimony indicated the gun allegedly taken from the victim by Vander was removed from the victim's right back pocket.
Considering all of the above, we find the trial court correctly concluded the defense failed to establish an overt act by the victim which would create in the mind of a reasonable person a belief that he was in imminent danger of losing his life or suffering great bodily harm. Accordingly, the trial court correctly prevented the defense from introducing any evidence of the victim's dangerous character.
Moreover, even assuming some overt act by the victim was established, the defense failed to lay the proper foundation for the particular testimony it sought to introduce into evidence to prove the victim's dangerous character. At trial a paramedic, Scott Sauls, testified a canister of cocaine fell out of the victim's right front pocket in the ambulance on the way to the hospital. The defense first attempted to establish the victim's dangerous character through the testimony of Sgt. Jimmy Estes of the St. Tammany Parish Sheriff's Office. The prosecutor objected that an overt act foundation had not been established, and the trial court sustained the objection. Out of the jury's presence, the defense explained that, if allowed to testify, Sgt. Estes would relate the victim's violent reaction in resisting an arrest on a drug charge. However, the trial court maintained its previous ruling that such evidence was inadmissible. In his brief to this court, defendant notes this particular arrest was for a cocaine charge and concludes the victim had violent tendencies while under the influence of cocaine and/or alcohol.
In a further attempt to establish the victim's dangerous character, the defense recalled Vander to the stand and attempted to question her about the victim's cocaine and alcohol consumption habits. However, the trial court again sustained the prosecutor's objection that such evidence could not be admitted in the absence of an overt act by the victim.
As noted by the state in its brief to this court, even if the overt act foundation was established, the defense failed to lay an additional foundation, i.e., that the victim was under the influence of cocaine and/or alcohol when the shooting occurred. It logically follows that, if the defense intended to prove the victim's dangerous character through testimony that he was violent when using cocaine and/or alcohol, it was necessary to first establish the victim was actually under the influence of cocaine and/or alcohol when the shooting occurred. However, no medical evidence was introduced at the trial to establish the presence of these drugs in the victim's blood. Furthermore, the prosecutor asked several state and defense witnesses whether the victim appeared intoxicated before the *1381 shooting and all of them responded that he did not.
For all of the above reasons, we find no error in the trial court's rulings preventing the defense from offering evidence of the victim's dangerous character. Accordingly, this assignment of error is without merit.
ASSIGNMENT OF ERROR NO. FOUR (ASSIGNMENT NO. THREE IN DEFENDANT'S BRIEF):
Defendant contends the trial court erred in allowing a state expert witness who did not perform the autopsy to testify concerning the cause of the victim's death. In connection with this assignment of error, defendant also contends that the trial court erred in allowing State Exhibit 5, the coroner's report, to be introduced into evidence over his objection.
At the trial, the coroner, Dr. Ted Brustowicz, testified a gunshot wound to the heart caused the victim's death. Brustowicz also testified he prepared the coroner's report, which was introduced into evidence as State Exhibit 5. Defendant objected both to Brustowicz's testimony and to the introduction into evidence of the coroner's report, but the trial court overruled both objections. On cross-examination, Brustowicz explained he did not perform the autopsy on the victim and never saw the victim. A forensic pathologist, Dr. Charles Odom, performed the autopsy. Brustowicz explained that he prepared the coroner's report based on information received from Odom and from a coroner's office investigator. At the conclusion of Brustowicz's testimony, defendant requested a mistrial based on the introduction into evidence of State Exhibit 5 and Brustowicz's testimony as to the cause of the victim's death when the autopsy actually had been conducted by Odom. The trial court denied this motion for a mistrial.
La.C.Cr.P. art. 105 provides, in pertinent part:
In a case involving the apparent commission of a crime, the coroner shall make a written report of his investigation to the district attorney within ten days after the completion thereof. In homicide cases the coroner's report shall certify the cause of death.
* * * * * *
A coroner's report and a proces verbal of an autopsy shall be competent evidence of death and the cause thereof, but not of any other fact.
In his brief to this court, defendant contends the coroner's report contained inadmissible hearsay and was erroneously admitted into evidence over his objection. He further complains of the denial of the right to confront Odom and the coroner's office investigator. He argues that because Brustowicz was not a forensic pathologist and did not perform the autopsy, he should not have been allowed to testify as to the victim's cause of death and, for the same reason, the coroner's report prepared by Brustowicz should not have been introduced into evidence.
In State v. Kelly, 375 So.2d 1344, 1348 (La.1979), the Louisiana Supreme Court concluded that La.C.Cr.P. art. 105 provides an exception to the hearsay rule. However, in an earlier case, State v. Berry, 324 So.2d 822, 829 (La.1975), cert. denied, 425 U.S. 954, 96 S.Ct. 1731, 48 L.Ed.2d 198 (1976), the Louisiana Supreme Court concluded a coroner's report and proces verbal of an autopsy were admissible, provided no confrontation rights were denied by the failure to allow cross-examination of the expert whose opinion was incorporated therein. In State v. Williams, 461 So.2d 1118, 1123-24 (La.App. 5th Cir.1984), the Fifth Circuit concluded the coroner's report and proces verbal were admissible, and the coroner or one of his assistants could give testimony thereon, even if they had not actually performed the autopsy on the victim.[3]
*1382 Other than personal information about the victim, such as his name, address, date of birth, Social Security number, and parents, the coroner's report contained only a conclusion that the victim's death was a homicide caused by a gunshot wound to the heart. In his brief to this court, defendant failed to allege any prejudice whatsoever resulting from the admission into evidence of the coroner's report or Brustowicz's testimony thereon. Assuming, arguendo, that State Exhibit 5 was erroneously introduced into evidence and that Brustowicz should not have been allowed to testify, we find no prejudice to defendant. The defense did not deny defendant shot and killed the victim in the Morocco Lounge shortly before midnight on February 17, 1989. The only issue in this case was whether defendant acted in self-defense or, alternatively, if this shooting constituted manslaughter rather than second degree murder. Under these circumstances, the introduction of the coroner's report and Brustowicz's testimony, both of which established that the victim died as the result of a gunshot wound to the heart, could not possibly have prejudiced defendant. Accordingly, we conclude any possible error in introducing State Exhibit 5 into evidence over defendant's objection, and/or allowing Brustowicz's testimony as to the victim's cause of death, was harmless beyond a reasonable doubt. See La.C.Cr.P. art. 921.
This assignment of error is without merit.
ASSIGNMENTS OF ERROR NOS. THREE AND SIX (ASSIGNMENTS NOS. ONE AND FOUR IN DEFENDANT'S BRIEF):
Defendant contests the sufficiency of the evidence. Specifically, he contends he shot the victim in self-defense or, at most, the shooting constituted manslaughter. Initially, we note that in order to challenge this conviction on the basis of insufficiency of the evidence, defendant should have proceeded by way of a motion for post-verdict judgment of acquittal. See La.C.Cr.P. art. 821. Nevertheless, we will consider a claim of insufficiency of the evidence which has been briefed pursuant to a formal assignment of error. See State v. Tate, 506 So.2d 546, 551 (La.App. 1st Cir.), writ denied, 511 So.2d 1152 (La.1987).
The standard of review for the sufficiency of the evidence to uphold a conviction is whether, viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could conclude the state proved the essential elements of the crime beyond a reasonable doubt. See La. C.Cr.P. art. 821; State v. King, 563 So.2d 449, 456 (La.App. 1st Cir.), writ denied, 567 So.2d 610 (La.1990).
LSA-R.S. 14:30.1 A(1) provides:
(A) Second degree murder is the killing of a human being:
(1) When the offender has a specific intent to kill or to inflict great bodily harm; ...
Specific intent is that state of mind which exists when the circumstances indicate the offender actively desired the prescribed criminal consequences to follow his act or failure to act. LSA-R.S. 14:10(1). Specific intent may be proven by direct evidence, such as statements by a defendant, or by inference from circumstantial evidence, such as a defendant's actions or facts depicting the circumstances. State v. Johnson, 461 So.2d 1273, 1277 (La.App. 1st Cir. 1984). The fact that defendant shot the victim in the chest with a pistol at a fairly close range indicates a specific intent to kill or to inflict great bodily harm. See LSA-R.S. 14:30.1 A(1); State v. Price, 498 So.2d 244, 247 (La.App. 1st Cir.1986), writ denied, 503 So.2d 474 (La.1987).
When self-defense is raised as an issue by the defendant, the state has the burden of proving, beyond a reasonable doubt, that the homicide was not perpetrated in self-defense. Thus, the issue in this case is whether a rational fact finder, viewing *1383 the evidence in the light most favorable to the prosecution, could have found beyond a reasonable doubt that the defendant did not kill the victim in self-defense. State v. Spears, 504 So.2d 974, 978 (La. App. 1st Cir.), writ denied, 507 So.2d 225 (La.1987).
LSA-R.S. 14:20(1) provides, in pertinent part:
A homicide is justifiable:
(1) When committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger; ...
At the trial, one defense witness, Casnave, testified a gun was removed from the victim's right back pocket after the shooting. A state witness, Ordogne, testified she believed the victim had a gun although she never saw it. No other witnesses testified that they saw the victim in possession of a gun or any other weapon or that they believed the victim possessed some kind of a weapon. Defendant did not testify at the trial. However, in his brief statement made at the time of his arrest, in an attempt to explain the shooting, defendant stated, "The dude kept jumping on me. He just kept jumping on me."
There was definitely a heated argument between defendant and the victim outside the bar. The testimony conflicts as to whether some type of verbal exchange immediately preceded the shooting. However, there was no testimony the victim actually "jumped on" defendant, struck him, or even touched him before the shooting. The shooting occurred at close range. The testimony definitely conflicted regarding the issue of which man approached the other inside the bar immediately before the shooting. Nevertheless, even accepting as true the testimony of Casnave that the victim had a gun in his right back pocket, there was no testimony the victim pulled this gun or any other weapon before the shooting or made any type of movement which could be construed as reaching for a concealed weapon. Before shooting the victim, defendant did not display his gun in a threatening manner or fire a warning shot.
As the trier of fact, the jury was free to accept or reject, in whole or in part, the testimony of any witness. State v. Richardson, 459 So.2d 31, 38 (La.App. 1st Cir.1984). Furthermore, where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. State v. Richardson, 459 So.2d at 38. The guilty verdict returned in this case indicates the jury rejected the defense theory of justifiable homicide. This guilty verdict was clearly supported by the evidence as to how the shooting occurred. Furthermore, defendant's actions after the shooting are also inconsistent with a theory of self-defense. After shooting the victim, defendant left the bar. Later that evening, he was given a ride to his apartment by Lonnie Laurent. Laurent testified when defendant got in the car, he was carrying a gun. Defendant informed Laurent he had just shot a man and he needed to get out of town because the police would be looking for him. Although the police searched for defendant that night, they did not locate him. At approximately 8:00 a.m. the day after the shooting, defendant walked into the Slidell Sheriff's Office Annex and surrendered. When questioned about the events after the shooting, defendant testified that he left the gun on the bar before walking out. However, at the trial, all the witnesses questioned on this point testified defendant left the bar with the gun, which was never recovered.
LSA-R.S. 14:31 A(1) provides:
A. Manslaughter is:
(1) A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden *1384 passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed; ...
The existence of "sudden passion" and "heat of blood" are not elements of the offense but, rather, are factors in the nature of mitigating circumstances which may reduce the grade of homicide. Provocation is a question of fact to be determined by the jury. Thus, the issue remaining is whether a rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could have found the mitigatory factors were not established by a preponderance of the evidence. State v. Lombard, 486 So.2d 106, 110-111 (La. 1986); State v. Smith, 490 So.2d 365, 370 (La.App. 1st Cir.), writ denied, 494 So.2d 324 (La.1986).
Having found the elements of second degree murder, the jury then had to determine whether the circumstances indicated the crime was actually manslaughter. The guilty verdict in this case indicates that the jury concluded this was a case of second degree murder and rejected the possibility of a manslaughter verdict. There is no doubt a heated argument between defendant and the victim took place outside the bar. After the argument, defendant drove away, presumably for the purpose of arming himself. Considering this fact, a rational trier of fact might well have concluded that, when defendant later returned to the bar and shot the victim, he acted with deliberation and reflection and not in the heat of passion. See State v. Ducksworth, 496 So.2d 624, 631 (La.App. 1st Cir. 1986). While there was conflicting testimony as to which man approached the other inside the bar and whether some type of verbal exchange took place immediately before the shooting, the guilty verdict indicates the jury concluded either: (1) that the argument(s) was (were) not sufficient provocation to deprive an average person of his self-control and cool reflection; or (2) that an average person's blood would have cooled before defendant shot the victim. See State v. Maddox, 522 So.2d 579, 582 (La.App. 1st Cir.1988).
We have carefully reviewed the record and find that the evidence supports the jury's determination. We are convinced a rational trier of fact, viewing all of the evidence as favorable to the prosecution as any rational fact finder can, could have concluded the state proved beyond a reasonable doubt defendant was guilty of second degree murder, that he did not kill the victim in self-defense, and that the mitigatory factors were not established by a preponderance of the evidence.
These assignments of error are without merit. Accordingly, we affirm defendant's conviction and sentence.
AFFIRMED.
NOTES
[1] As noted above, the defendant's fifth assignment of error assigned all errors patent on the face of the record. Such an assignment of error is unnecessary, as this Court routinely reviews the record for errors patent, whether or not such a request is made by a defendant. See La.C.Cr.P. art. 920(2). Although the defendant abandoned this assignment of error by failing to address it in his brief, we have nevertheless reviewed the record in these proceedings for errors patent and have found none.
[2] Throughout this transcript, references are made by the reporter to certain demonstrations. Unfortunately, these nonverbal communications were never described for the record by either party.
[3] Williams was subsequently overruled on an unrelated issue (double jeopardy) by State v. Wilson, 538 So.2d 1124, 1128 (La.App. 5th Cir. 1989).